**Ex parte Clarence Lee BRANDLEY, Applicant.**

No. 70719.

Court of Criminal Appeals of Texas, En Banc.

Dec. 13, 1989.

Rehearing Denied Jan. 17, 1990.

Mike DeGeurin, Paul Nugent, Houston, Donald M. Brown, Conroe, for appellant.

Peter C. Speers, III, Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

OPINION

BERCHELMANN, Judge.

This is an application for writ of habeas corpus. Tex.Code Crim.Proc.Ann. art. 11.-07. Applicant was twice tried for the capital murder of Cheryl Ferguson. Applicant's first trial ended in a mistrial when the jury was unable to reach a verdict. In his second trial, applicant was found guilty as indicted. On direct appeal, we affirmed applicant's conviction holding, among other things, that the evidence was sufficient to support the jury's verdict. *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985): While the record on direct appeal supports that holding, the evidence adduced pursuant to this application raises other constitutional issues irrelevant to the sufficiency question.

Applicant's petition for writ of habeas corpus raises seven grounds, one of which alleges that the State's investigative procedure violated his right to due process of law and a fundamentally fair trial. One of the facts underpinning that assertion demonstrates that the State failed to provide appellant's counsel with potentially exculpatory information in the State's possession that two men were witnessed near the scene of the crime shortly after the victim was last seen alive.

Because applicant alleged claims of constitutional dimension based upon controverted, previously unresolved facts which are material to his confinement, we ordered the trial court to hold a hearing pursuant to this application. See Tex.Code Crim. Proc.Ann. art. 11.07, Sec. 2. In *Ex parte Adams*, 768 S.W.2d 281 (Tex.Cr.App.1989), less than a year ago this Court unanimously found that Adams's application for writ of habeas corpus, alleging a due process violation based upon facts requiring an evidentiary hearing, was properly before us. This Court has long recognized the cognizibility of due process claims in original habeas corpus proceedings. *Ex parte Bush*, 166 Tex.Cr.R. 259, 313 S.W.2d 287 (1958).

The trial court held an extensive hearing pursuant to this application and entered findings of fact and conclusions of law favorable to applicant. Therein the judge presiding over the hearing concluded that applicant was denied a fair trial and due process of law. Commenting upon the testimony adduced at the hearing, the trial court stated:

> The litany of events graphically described by the witnesses, some of it chilling and shocking, leads me to the conclusion the pervasive shadow of darkness has obscured the light of fundamental decency and human rights. I can only sadly state justice has been on trial here, but of more significance, injustice has been on trial.

Applicant alleges that the State's pretrial investigative procedures were "so impermissibly suggestive of applicant that it created false testimony calculated to manufacture circumstantial evidence against applicant in violation of his right to due process and a fundamentally fair trial." The trial court found that the State failed to "conduct a proper investigation," and that the investigation had a "blind focus" which ignored leads to evidence inconsistent with the "premature conclusion that [applicant] had committed the crime." The trial court's conclusions of law state that the investigative procedure was "so impermissibly suggestive that false testimony was created, thereby denying [applicant] of due process of law and a fundamentally fair trial."

■ While this Court is not bound by the findings of a trial court in a habeas corpus proceeding, *Ex parte Bates*, 640 S.W.2d 894 (Tex.Cr.App.1982), where the trial court's findings are supported by the record, they should be considered, if not accepted. *Ex parte Adams*, 768 S.W.2d at 288; *Ex parte McCormick*, 645 S.W.2d 801 (Tex.Cr.App.1983). In *Ex parte Turner*, 545 S.W.2d 470 (Tex.Cr.App.1977), we held that although this Court has the ultimate power to decide matters of fact in habeas proceedings, generally if the trial court's

findings are supported by the record, they should be accepted by this Court.[1]

## I.

Set forth below is a summary of the findings of fact, entered by the judge presiding over the habeas hearing, which are supported by the record.

Applicant was indicted, convicted and sentenced to death for the sexual assault and murder of Cheryl Ferguson. Ferguson's death occurred on Saturday, August 23, 1980 during a girls' volleyball tournament held at Conroe High School. The fall semester was scheduled to begin on Monday, August 31. The authorities announced to the public that a suspect would be arrested prior to the commencement of classes. Texas Ranger Wesley Styles was called in to head the investigation. Styles began his investigation on the evening of Thursday, August 28, three days before classes were scheduled to resume. The next day, prior to interviewing any witnesses, Styles arrested applicant, a janitor of the high school. On Saturday, August 30, Styles arranged for three other Conroe High School janitors, Gary Acreman, Sam Martinez and John Sessum, to meet at the high school. Styles did not interview them separately, but instead conducted a "walk through" wherein the janitors were walked through the sequence of events of the day of the murder, and were questioned in each others presence. Gary Acreman did most of the talking at the walk through.

John Sessum testified at applicant's first trial. His testimony at trial was consistent with the story generated by the walk through, that is, that applicant approached the stairwell after the victim walked up the stairs and headed into the restroom. At the evidentiary hearing, however, Sessum admitted that he committed perjury at applicant's first trial and lied in his statement to the authorities because he was in fear of both Acreman and Styles. He testified at the hearing that Acreman talked to the victim as she approached the stairwell. Acreman followed her up the stairs, talked to her at the top of the stairs, and then grabbed the victim. Acreman was accompanied by a former janitor of the high school, later identified as James Dexter Robinson.[2] The victim screamed, "No" and "Don't," and cried for help. Contrary to his prior statements, Sessum testified that applicant did not arrive until five or ten minutes after the girl was accosted.

Sessum further testified that when Acreman drove him home the day of the murder, Acreman warned him that if Sessum told anyone there would be "trouble" for Sessum. Acreman repeated his warning to Sessum prior to the "walk through." When Sessum tried to tell Styles about Acreman, Styles threatened to arrest Sessum if Sessum did not cooperate with the walk through. Sessum testified that in 1987 he was assaulted by an unknown man who was inquiring about Sessum implicating Acreman in the death of the victim.

1. In his dissenting opinion to this cause, the Presiding Judge disregards the overwhelming evidence supporting the trial court's findings in an impassioned attempt to reject those findings. Instead of looking at the evidence in support of the findings, that opinion attempts to contradict them by citing snippets of grand jury and trial testimony, at times out of context and other times in a less than complete fashion, in addition to offering personal gratuitous observations. Of course, this is not, nor has it ever been, the appropriate standard of review of a trial court's findings. See, for example, Judge Duncan's concurring opinion, infra, for a more detailed explanation of this problem.

2. Brenda Medina, the woman with whom Robinson lived at the time of the murder, testified

at the evidentiary hearing that the day of the murder Robinson did not return home until after midnight. Robinson awakened Medina and stated that he had to leave the state because he killed a girl, but that he had hidden the girl's body so well that no one would find her until he was out of town. Robinson left the state early that morning, leaving behind his blood stained tennis shoes. The record reflects that Medina first told this information to her attorney in 1986. Medina's attorney informed the District Attorney's Office of the extra judicial confession. When Medina's attorney learned that the District Attorney's Office failed to inform defense counsel of this information, he notified defense counsel about Robinson's confession.

The trial court found Sessum's testimony at the evidentiary hearing credible.

Gary Acreman testified at both of applicant's trials and the evidentiary hearing. His testimony at trial was consistent with the story generated by the walk through; viz: the victim walked up the stairs and toward the restroom, followed shortly thereafter by applicant. At the hearing, applicant entered into evidence two videotaped statements made by Acreman in which Acreman proclaimed applicant's innocence and stated that James Dexter Robinson followed the victim up the stairs, Acreman heard the girl yell, "No," and Acreman saw Robinson grab the girl and drag her into the restroom as she screamed for help. In the videotaped statements, Acreman stated that Robinson threatened him into lying about the murder. Acreman repeated again and again on the videotaped statements that applicant had nothing to to with the murder and that applicant was "being railroaded."

At the hearing, Acreman recanted the statements on the videotapes. After much vacillation, Acreman admitted that Robinson was, in fact, at the school that day. Acreman admitted that the statements generated by the walk through were incorrect in that they failed to acknowledge that Acreman spoke to the victim shortly before her death. Acreman claimed that the conversation completely slipped his mind until the evidentiary hearing held seven years after the murder. Acreman testified to a new found memory that he left the other janitors after speaking with the victim, despite his trial testimony that he, Sessum and Martinez were together when the girl was murdered.

The third janitor attending the walk through was Sam Martinez. Prior to the walk through, Martinez gave a statement with a differing version of events of the day of the murder. Two days after the murder, Martinez gave a statement that the victim walked up a stairwell and headed towards the restroom after applicant had come up the stairs. After Styles' walk through, Martinez changed his story to coincide with walk through version of events; that is, applicant approached the stairwell after the victim walked up the stairs and headed into the restroom. Martinez explained the inconsistencies between the two statements by stating that the walk through "helped me a whole lot." At the evidentiary hearing, Martinez changed the story produced by the walk through by stating that the victim asked the janitors where the restroom was located and that Acreman spoke to the victim. Prior to the evidentiary hearing, Martinez, who gave two statements to the police and testified at both of applicant's trials, never admitted this conversation took place. Martinez also changed the walk through version of events to which he testified at applicant's trials by stating that Acreman spent approximately thirty minutes away from Martinez and Sessum shortly after the victim went into the restroom.

Sessum, Acreman and Martinez signed written statements following the walk through, but Styles did not supervise the taking of the statements. Styles testified that he had no idea whether the statements were accurate, and could offer no explanation why Sessum's statement was not signed until one month after the walk through. The trial court noted that the three written statements taken immediately following the walk through were consistent as to the critical sequence of events and the critical time frames.

Henry Martin Peace, the janitor who discovered the victim, testified on behalf of the State at both of applicant's trials. Peace circumstantially implicated applicant by stating that applicant repeatedly ordered Peace to search the loft where the girl's body was found, until Peace ultimately discovered the victim.

At the hearing Peace stated that Styles arrived at Peace's home one night and forced Peace against the wall, choking Peace by twisting the chain Peace wore around his neck. Peace, a man the trial court noted as being under five foot tall,

was taken to the Cleveland Police Station until 1:30 in the morning. En route, Styles threatened to "blow" Peace's brains out. When Peace complained of Styles' treatment to the District Attorney's Office, Peace was told that the office would "take care of it." Later the members of the District Attorney's Office told Peace he was "hallucinating" that Styles had manhandled him. Peace testified that he continues to fear Styles.

Peace was not allowed to leave the police station until he signed a written statement, despite his inability to read or write. Peace asked that a family member be permitted to read the statement to him before he signed it, but the police denied Peace's request. On another occasion, Peace was told by a police officer that Peace was too small to have committed the sexual assault and murder, but that "the nigger" [referring to applicant] was big enough to have committed the crime; therefore, "the nigger was elected."

The trial court found that the murder investigation was so contrived that it created false testimony and that the investigation failed to follow any leads which did not comport with the preconceived, premature notion that applicant committed the murder. Styles admitted at the evidentiary hearing that before he arrived in Conroe and prior to interviewing any witnesses, applicant was his only suspect. Styles maintained this blind focus despite the fact that a Caucasian pubic hair, not belonging to the victim, was found near the victim's vagina. The State resisted all efforts to obtain hair samples for comparison from the three janitors who saw the victim moments before the assault.[3] When pressed for a reason why he did not want to obtain a hair sample from Acreman to compare with the Caucasian pubic hair found near the victim's vagina, Styles testified at the evidentiary hearing, "Let's say I didn't do it and it wasn't done, and why it wasn't done, I don't know."

Additionally, the State resisted all attempts to obtain blood samples from Acreman, Martinez and Sessum despite finding blood inconsistent with applicant's blood type on the victim's shirt. Type A blood was found on the shirt, and although the victim had Type A blood, there were no lacerations to any part of her body, indicating that the blood may have originated from the perpetrator. Applicant has Type O blood. Not until years after the murder, when the Texas Attorney General's Office began to investigate the validity of applicant's conviction, did the State finally obtain samples of blood from Acreman and Robinson. Both men have Type A blood.[4]

Moreover, after the autopsy discovered the existence of semen in the victim's vagina, the State failed to run an analysis of the sample to determine the blood type of the donor. Dr. Joseph Jachimczyck, now the Harris County Medical Examiner, testified at the evidentiary hearing that his office did not test for the blood type of the donor, and that he did not know whether the samples were given to the Conroe Police Department. A detective from the Sex Crimes Unit of the Homicide Division of the Houston Police Department testified at the hearing that it was standard police procedure in 1980 to preserve the vaginal swabs taken in sexual assault investigations, and that there is no justification to discard the swabs because they can scientifically exclude suspects based on blood typing, Rh factor and other genetic characteristics of the donor of the spermatozoa.

Likewise, the State failed to investigate a lead from Cheryl Bradford, a volleyball

3. It would be futile to obtain samples for comparison today, for the exhibit containing the Caucasian hair became missing while the record was being prepared for direct appeal.

4. The blood samples finally obtained from Acreman and Robinson cannot be compared with the blood found on the victim's shirt because the blood stained shirt also became missing when the record was being prepared for direct appeal.

Notwithstanding the Presiding Judge's assertion to the contrary in his dissenting opinion, these facts regarding the bloody clothing are uncontradicted by the record and the parties in this cause.

participant. Bradford testified at the evidentiary hearing that the day of the murder, she passed the victim in the hallway as Bradford returned from the restroom. Bradford thereafter proceeded to the gymnasium and began warming up for the game. Twenty to thirty minutes after last seeing the victim alive, Bradford observed two white men rushing through the gymnasium. She recalled seeing the men because there were no males attending the volleyball tournament. Her descriptions of the two men matched the height, weight and hair color characteristics of the pair now accused by Sessum as having committed the murder, Gary Acreman and James Dexter Robinson.[5] After the victim's body was discovered, Bradford told her volleyball coach about the men. Bradford and her coach contacted the Conroe Police Department with the lead, but the police "were not real interested in [her] information and were in a rush to get [her] off the phone." The police never contacted Bradford for further information, nor did any government agency ever inform defense counsel of the incident. Eight years after the murder, Bradford saw a televised program questioning the validity of applicant's conviction. She got "chills" when she saw a televised picture of James Dexter Robinson, although unable to identify Robinson as one of the men she saw rushing through the auditorium. She subsequently recontacted the authorities about witnessing the men. Trial counsel for applicant were never informed about this information.

Styles also failed to investigate a lead given by Peace after Styles conducted the walk through with the other janitors. Peace informed Styles that the day of the murder Acreman re-entered the high school alone and stated that applicant was "having fun with a good looking girl." Despite the prospect that either Acreman may have witnessed the offense or a related act, or

that Acreman may have floated a false story about applicant, Styles never asked Acreman about the meaning of the statement. Regarding his failure to investigate the statement, Styles testified, "I might've should have asked [Acreman], but I didn't." He also stated that he did not investigate the statement because it was "hearsay."

## II.

■ Where the State's investigative procedure is so improper, it may result in a denial of an accused's rights to due process of law. *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Dispensa v. Lynaugh*, 847 F.2d 211, 218 (5th Cir.1988). In *Foster*, the Supreme Court held that where the State orchestrated an identification procedure "so unnecessarily suggestive and conducive to irreparable mistaken identification" of an accused, the State's conduct may amount to a denial of due process, judged by the totality of the circumstances. *Id.*, 394 U.S. at 442, 89 S.Ct. at 1128, citing and quoting *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

Although *Foster* involves impermissible State conduct in an identification procedure, the Due Process Clause of the Fourteenth Amendment is not limited to the State's action in that narrow context. For example, due process is not satisfied where the State contrives a conviction "through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty." *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935) (State's use of perjured testimony). Nor is due process satisfied where the State fails to correct unsolicited perjury, *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), nor where the State suppresses evidence favorable to the accused. *Brady v. Maryland*,

---

5. Bradford's statements undermine the State's theory of the case that applicant was the only janitor whose presence was unaccounted for at the time of, and following, the murder. Additionally, this information conflicts with the now recanted trial testimony of Acreman, Martinez and Sessum that they were exclusively in each other's company after the girl entered the restroom.

373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Likewise, where the State's conviction is based in part upon the introduction of a coerced confession, a defendant's right to due process is violated, *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961), and where the State conceals a material witness whose testimony is shown to create a reasonable doubt of guilt that did not otherwise exist, there is also a deprivation of due process. *Hernandez v. Estelle*, 674 F.2d 313 (5th Cir.1981).

■ Although our review of the record supports the trial court's finding that the State's investigation was flawed, we must now determine whether these facts support the trial court's conclusion of law that the investigation lead to a denial of applicant's right to due process and fundamental fairness. We look to the "totality of the circumstances" to make that determination. *Ex parte Adams*, 768 S.W.2d at 293; *Foster*, 394 U.S. at 442, 89 S.Ct. at 1128.

■ We note at the outset, as we did on direct appeal, that applicant's conviction is based entirely on circumstantial evidence. *Brandley*, 691 S.W.2d at 701. State misconduct is more likely to affect the outcome of the trial based upon circumstantial evidence than one in which there is direct evidence, untainted by State misconduct, linking a defendant to the crime.[6]

The State's suppression of Bradford's information that she saw a man meeting

Acreman's description near the scene of the crime shortly after the victim was attacked undermines Acreman's now recanted testimony that he was in a different building with the other janitors at the time in question. At the very least, it establishes that men other than applicant were near the scene of the crime shortly after the victim was last seen alive. Given Bradford's hearing testimony that she saw no men attending the volleyball tournament at the time in question, this information becomes more significant by establishing other suspects, if not impeaching Acreman's testimony regarding his whereabouts.[7]

A review of applicant's pleadings reflects that applicant, albeit inartfully, alleges that this evidence supports a due process claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 which prohibits State suppression of "evidence favorable to an accused ... where the evidence is material either to guilt or to the punishment, irrespective of the good faith or bad faith of the prosecution," *Id.*, at 87, 83 S.Ct. at 1196. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court held that the due process requirements addressed in *Brady*, supra, applied to the suppression of impeachment evidence, and where such evidence was suppressed, a new trial must be granted where the confidence in the outcome of the trial is undermined. *Bagley*, at 683, 105 S.Ct. at 3383. To require reversal pursuant to a *Brady* claim, however, the

---

6. For example, where a defendant alleges a due process violation based upon the State's failure to inform him of potentially exculpatory evidence, the "materiality" requirement focuses upon whether the suppressed evidence might have affected the outcome of the trial. *U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). See also *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

7. The State urges that the District Attorney's Office was not aware of Bradford's statements to the police. However, in determining a due process violation we have declined in the past to distinguish different agencies under the same government, focusing instead upon the prosecuting team, which includes both investigative

and prosecutorial personnel. *Ex parte Adams*, 768 S.W.2d at 292, citing *U.S. v. Antone*, 603 F.2d 566, 569 (5th Cir.1979).

Additionally, any suggestion by the Presiding Judge in his dissenting opinion that Bradford's testimony at the hearing is unworthy of belief or is immaterial because it is "unsubstantiated" simply begs the question. *Ex parte Brandley*, 781 S.W.2d at 904 (McCormick, P.J. dissenting). Moreover, to imply that her testimony is irrelevant because a police officer testified at trial that there were men at the tournament is factually misleading. Bradford's testimony regarding seeing no other men concerns the time frame in which the victim disappeared. The police officer's testimony relates to a time frame hours later.

State's suppression of evidence must be considered material. Evidence is considered material where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, at 682, 105 S.Ct. at 3383 (1985).

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court addressed the materiality requirement:

> It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.*, at 112–13, 96 S.Ct. at 2402 (footnote omitted).

In *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384, the Supreme Court instructed appellate courts to make the materiality determination "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense [been given access to the suppressed evidence]." Whether Bradford's statements to the police are analyzed pursuant to applicant's broader due process claim based upon the entire investigation, or regarding applicant's more specific due process claim under *Brady*, we are compelled to look further and consider the totality of the circumstances of the trial.

Additionally, applicant submits that the "walk through" of Acreman, Sessum and Martinez contributed to a due process violation by creating false testimony. The trial court found that the walk through served as a means of intimidating Sessum into following the story generated by the walk through, for Sessum was threatened with arrest when he attempted to inform the authorities about Acreman's involvement in the murder. The walk through undoubtedly injected false testimony into applicant's first trial, for Sessum admitted that he committed perjury at applicant's first trial. However, Sessum did not testify at applicant's second trial. Acreman and Martinez did testify at the second trial, adhering to the walk through story. Both Acreman and Martinez acknowledged at the evidentiary hearing that the walk through story is incomplete, in that Acreman did, in fact, speak with the victim shortly before she was murdered. The habeas judge found Martinez's and Acreman's explanations that they forgot Acreman's conversation with the girl, until seven years after the murder, are unworthy of belief.

Both men also recanted the walk through story and professed a new found memory at the evidentiary hearing by testifying that Acreman was not with Martinez and Sessum for a thirty minute interval after Acreman spoke with the victim. The harm resulting from the walk through story that Acreman was with the other janitors when the victim was abducted is underscored by this Court's treatment of the evidence on direct appeal. We found the evidence sufficient to support applicant's conviction holding that there were no reasonable hypotheses other than applicant's guilt, based in part upon the fact that the whereabouts of Acreman, Sessum and Martinez were accounted for at the time of the murder. *Brandley*, 691 S.W.2d at 704.

Additionally, Styles' manhandling and threats to kill the diminutive Peace, the State's star witness, taints the reliability of Peace's trial testimony. The psychological pressure exerted on Peace to circumstantially implicate applicant would potentially undermine the fact finder's confidence in

the product of such coercion.[8]

The State's refusal to obtain hair and blood samples from the three janitors who saw the victim enter the restroom creates problems of a different type. Despite evidence that a Caucasian hair, not belonging to the victim, was found on her, and despite the evidence that blood inconsistent with applicant's blood type was found on the victim's shirt, the State resisted efforts to obtain samples from Acreman, Martinez and Sessum. Because these pieces of evidence were lost in Montgomery County while the record was being prepared for direct appeal, no tests can now be performed on these items.

Absent a showing of bad faith on the part of the police, failure to preserve potentially useful evidence does not, in and of itself, result in the denial of due process of law. *Arizona v. Youngblood*, — U.S. ——, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). However, in the case at bar, the State's apparent refusal to perform certain scientific tests on the physical evidence at hand resulted in a lack of direct evidence in this case. This lack of direct evidence buttresses applicant's claim that the error resulting from the State's other improper conduct affected the outcome of his trial.

Although any of these incidences alone might not support applicant's claim, there can be no doubt that the cumulative effect of the investigative procedure, judged by the totality of the circumstances, resulted in a deprivation of applicant's right to due process of law by suppressing evidence favorable to the accused, and by creating false testimony and inherently unreliable testimony.[9] Accordingly, applicant's conviction must be reversed.

Due process of law is the cornerstone of a civilized system of justice. Our society wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when an accused is treated unfairly. *Brady*, 378 U.S. at 87, 83 S.Ct. at 1197. The State's investigative procedure produced a trial lacking the rudiments of fairness. The principles of due process, embodied within the United States Constitution, must not, indeed cannot, countenance such blatant unfairness.

The violent end to Cheryl Ferguson's young life is both senseless and tragic. The end of a life so full of promise is a loss not only to her loved-ones, but also to our society as a whole. Our outrage over her murder, however, cannot justify the subversion of justice that took place during the investigation, which ultimately affected the trial of her accused perpetrator.

We therefore set aside applicant's conviction, and order applicant released to the

---

8. Although acknowledging Peace's repeated perjury on collateral issues, the dissenting opinion surmises that the investigative procedure "did not produce any unreliable testimony" from Peace. *Ex parte Brandley*, 781 S.W.2d 904 (Campbell, J. dissenting). The record contradicts this bold assertion. Peace's hearing testimony conflicts with his trial testimony regarding Styles' mistreatment. At trial, Peace testified as follows:

> Q. [Defense Counsel] Did Ranger Styles influence you in any way on your testimony in this case?
> A. [Peace] No, Sir. Nobody has.
> * * * * * *
> Q. Wesley Styles—was he good to you? Treat you fair?
> A. He didn't mistreat me. No, Sir.

Peace's hearing testimony recounts abusive treatment which, according to Peace, was reported to the District Attorney's Office. Notwithstanding the District Attorney's knowledge of Styles' mistreatment of Peace, the State failed to correct Peace's false testimony adduced at trial. This evidence alone arguably supports yet another due process violation: The State's use of perjured testimony. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957). See also *Ex parte Adams*, 768 S.W.2d 281.

Moreover, Peace acknowledged at trial that the statement the police prepared for Peace, and signed by Peace despite his inability to read or write, is riddled with inconsistencies. He testified to five separate false statements in the document.

Lastly, Peace also acknowledged committing perjury at applicant's first trial regarding Peace's display of a pistol at the high school prior to the date of the murder. Simply put, the dissenting opinion's implication that Peace's statements have been consistent is simply not supported by the record.

9. We hold that the error attendant to this case would not prevent the readmission of evidence upon retrial, assuming, of course, that the procedural prerequisites to its admission are met.

Sheriff of Montgomery County to answer the indictment upon which applicant was convicted.

WHITE, J., concurs in the result.

DUNCAN, Judge, concurring.

I join the majority opinion; however, I write separately only to comment briefly upon the dissenting opinions. In fiscal year 1987–1988 (September 1, 1987 to August 31, 1988), this Court denied or dismissed 2,259 post-conviction applications for writs of habeas corpus. See *Texas Judicial System: 60th Annual Report* (Office of Court Administration: Austin, 1988), p. 168. These sheer numbers, if nothing else, emphasize the commitment of this Court to respect the objective and, under certain circumstances, subjective findings made by the trial court in a post-conviction habeas corpus hearing. Ten months ago, in *Ex parte Adams*, 768 S.W.2d 281 (Tex.Cr.App.1989), this Court unanimously quoted with approval the language of *Ex parte Moore*, 126 S.W.2d 27 (Tex.Cr.App.1939). In *Moore* the Court stated:

> Where the ruling of the trial judge depends upon the existence or non-existence of a certain fact and testimony pro and con is introduced thereon and the evidence is conflicting it becomes the duty of the trial judge to determine the issue, and unless it appears to this court that his finding was without support in the evidence, and that he had committed an error in his judgment thereon, we would not interfere with his findings thereon. *Id.*, 126 S.W.2d at 28.

The cases are absolutely legion, and I do not use that word loosely, to support the foregoing proposition. That is as it should be. This Court should not get into the position of having to make credibility judgments every time there is conflicting testimony. This case is really very simple: this Court initially found that there was a legitimate constitutional issue raised regarding a claimed deprivation of due process and

ordered a hearing to be conducted; the hearing was held; Judge Pickett made findings of fact and conclusions of law recommending relief be granted; the findings of fact are supported by the record and the conclusions of law are not erroneous. Therefore, they should be accepted.

We must take the record as we find it. Accordingly, we cannot add facts, assume facts, disregard facts, or accord certain facts greater or lesser significance. That is simply not our function. There is no question that the abundance of material presented with this case makes our task extremely difficult. That is why the trial judge is accorded the deference to make findings of fact. All that we should do is determine whether they are supported by the record. That is all. I have read every page of the writ hearing and although I may not have made the same findings of fact or conclusions of law as Judge Pickett, I do find that they are supported by the record. Consequently, unless we are willing to overrule all of the cases to the contrary or conjure up a way to deceptively distinguish them we actually have no choice but to accept the findings and conclusions that have support in the record.

Judge Campbell, in his dissenting opinion, also takes issue with the specific ground upon which relief is granted and claims that it is actually newly discovered evidence "wrap[ped] ... in the more attractive cloak of due process ..." Dissenting Opinion, slip op. p. 898. To continue the metaphor: whether the issue is clothed or wrapped in due process is irrelevant. I agree that this Court should not be the repository of every complaint that can be made relative to a claim of newly discovered evidence. But, in the context of this case, when fundamental liberties have been deprived then the newly discovered evidence is the equivalent of a due process violation. And, Judge Campbell's conclusion implicitly concedes that a due process right was implicated. He dismisses it on the basis that he would not have made the same findings as Judge Pickett. As I stat-

ed previously, I might not have either, but that is not the issue. Judge Pickett's findings are supported by the record. Thus, they should be accepted.

The majority opinion recognizes this. That is why I have joined the opinion.

MILLER, J., joins.

McCORMICK, Presiding Judge, dissenting.

I join Judge Campbell's Dissenting Opinion and reiterate that even if every finding by the habeas court is taken as true, there is no legal precedent upon which the majority can grant the relief it does. The records before this Court of applicant's two trials and two habeas hearings totally belie the habeas court's findings of fact. The only "blind focus" which has occurred in the history of this cause comes today with an opinion that so manipulates the law and the facts as to do irreparable harm to the future of Article 11.07, V.A.C.C.P.

I write merely to point out a few of the many glaring factual errors made in the majority opinion. Although the findings of the habeas court, if taken as factual, may raise the specter that another or others may have been involved with applicant in the commission of this murder, there is absolutely no evidence which remotely tends to exculpate applicant or to show that he is not guilty.

In finding that applicant is entitled to habeas corpus relief in this case, the majority has relied extensively upon the habeas court's findings of fact. The habeas judge [1] has concluded, and the majority agrees, that the State has violated applicant's due process rights because "the investigative procedure was so impermissibly suggestive that false testimony was created." Although neither the habeas court nor the majority has cited relevant authority, both rest their conclusions on "the facts

underpinning" the habeas court's conclusions. Significant findings by the habeas court, however, either are not supported by the record, are clearly erroneous, or are the result of testimony taken out of context. Almost all findings by the habeas court judge that are utilized by the majority are inaccurate in some form.

The majority begins its recitation of the facts relating to the investigation of the murder by stating that Texas Ranger Wesley Styles was called in to head the investigation and that he immediately arrested applicant. This is not supported by the record and is the first of many absolutely distorted and biased reporting of the record. The District Attorney of Montgomery County, James Keeshan, called Styles to aid in the prosecution after the Conroe Police Department had already developed evidence relating to the murder. Among the facts known to the Conroe Police and Styles before the arrest of applicant were: Cheryl Ferguson was a member of a girl's volleyball team that had come to Conroe High School at around nine o'clock on Saturday morning, August 23, 1980, to participate in a tournament. For some reason or another, Cheryl had left the gym area where the other girls had begun to warm up for their matches. When Cheryl did not return the other girls began to search the school grounds.

Written, sworn statements were taken from applicant and three other Conroe High School janitors (Sam Martinez, Gary Acreman and Henry Peace) before applicant's arrest and before Styles's involvement. These initial statements are all consistent regarding the following: On Saturday morning, August 23, 1980, four janitors along with applicant, their supervisor, were preparing the school for various activities. Applicant had directed the janitors to set up chairs in the school cafeteria. The janitors finished their jobs. While looking for applicant to see if anything else needed

---

**1.** Neither of the trial court judges that sat during applicant's trials participated in the hearing which resulted in the findings of fact upon which the majority rests its decision. A reading of *all* the records of applicant's trials and hearings demonstrates the total failure of the habeas judge to review these records.

to be done, they saw a girl go into the restroom. After the girl entered the restroom, applicant arrived with toilet paper. One of the janitors told applicant that a girl was in the restroom. Applicant told the janitors to go across the street to the vocational building. The janitors did so and waited there for applicant to come open the doors. Applicant, however, never came over to the building. About forty-five minutes later, applicant called across the street to one of the janitors to come and get the keys to the doors. The janitors completed their tasks in the building and were told by applicant to go home. Peace remained to help applicant lock the cafeteria doors. While doing so, applicant and Peace ran into the volleyball players looking for Cheryl. Applicant decided to look for the girl. He and Peace found the door to the auditorium to be unlocked; they checked inside. Applicant told Peace to look in the balcony behind the stage area "because some of the kids would get behind the boards and hide." (Applicant's Statement.) Peace discovered Cheryl's body behind a sheet of plywood.

The murder occurred on August 23, 1980. The District Attorney's Office, requested Styles's assistance in the investigation on August 28, 1980, and Styles began work on the case the next day. When Styles arrested applicant he was armed with information by the Conroe Police Department along with an arrest warrant supported by the following affidavit:

"Affiant, an officer with the Conroe Police Department (CPD) investigated the above offense along with other CPD officers. The victim, a 16 year old white female was found naked and strangled in a loft area above the auditorium stage in the main building at the Conroe High School. She had been missing for about two hours when her body was found. The victim had been at the school for a short time to attend a volleyball tournament being held in a gym near the main building. CPD officers found her clothing two days later in a plastic bag identical to those used by school personnel.

Affiant and other CPD officers interviewed and took statements from tournament participants and from all custodians on duty on the morning of August 23, 1980 when the crime occurred. Based on the location of the body, the disposal of the clothing and the fact that auditorium and other doors in the main building were normally locked on Saturday (as this was), it appeared that the offense was probably committed by an employee of the school.

"Affiant has probable cause to believe and does believe that the offense was committed by Clarence Brandley, a black male, for the following reasons:

"1. Brandley was arrested by CPD officers for committing an attempted rape and abduction on 3/7/79 according to CPD offense reports.

"2. Said Brandley is presently on felony probation for possession of a prohibited weapon.

"3. Said Brandley, according to four other custodians, was the only school employee in or around the main building who had keys to the auditorium, storerooms and other doors in the building at the time of the offense.

"4. According to the other custodians, Brandley's whereabouts are unaccounted for during a 45–minute period at about the same time as that of the victim's disappearance.

"5. A pubic hair found on the victim's body has been determined by the Department of Public Safety Lab in Austin, Texas, to be that of a black male, and appears identical to pubic hairs removed from said Brandley's person.

"6. Said Brandley is the only custodian or employee who was on duty at the location who is a black male.

"7. A Houston Police Department Polygraph Supervisor advised Captain Monty Koerner that said Brandley had failed a polygraph test administered to him on August 25, 1980, in connection with the offense."

The majority's statement that Styles arrested applicant with the "preconceived,

premature notion that applicant had committed the murder," ignores that Styles had the written statements of essential witnesses before him and arrested applicant under judicial authority. Any implication made by the majority that Styles investigated the murder offense without resort to relevant information in an effort to convict applicant is not supported by the record and should be rejected.

The majority opinion also attempts to discredit the walk-through that Styles conducted with three of the janitors. The majority writes that the walk-through "generated" stories. The majority therefore holds that because one of the janitors, John Sessums, is now implicating Gary Acreman nine years after the murder, this leads to the conclusion that the walk-through "created false testimony."

The majority is wrong. First, as Judge Campbell points out in his dissent, John Sessums did not testify at applicant's trial.[2] It is, therefore, impossible that anything he now asserts as being true created false testimony on his part at trial. It is outstanding that the majority is willing to place faith in Sessums's writ hearing testimony when, *even before the walk-through,* Sessums gave the following sworn statement to police:

"I came to the school about 8:00 A.M., I rode to work with Gary in his Datsun Pickup, orange and white color. We park in front of the vocational building. We walked over to the main building, the doors were all locked and we waited for Clarence. We waited about 10 or 15 minutes. Sammie came up after we got there and was also waiting. Clarence came down the sidewalk and opened the door. There was another subject Eckie a

short stockey guy, he also came up about the time as we did. All five (5) of us then went to the cafeteria and Clarence showed us where to set up the tables and chairs. It took about a hour and a half to set up the chairs. When we finished we walked out in the hall to the front of the building. We waited 10 or 15 minutes. There were a couple of people standing in the hall around the end where the gym is. When Clarence came up a girl was coming up behind. We kidded him about watching out, there is a pretty girl coming up behind him. She had blond shoulder length hair, about 5' tall, she had blue jeans and a pullover sweater on. Clarence told us what we had to do and where to go. The four (4) of us then went to the annex to set up chairs. Clarence said he had something to so and stayed behind. We set at the annex about five (5) minutes, then Eckie went back and got the key from Clarence. When he got back we set up the tables and chairs. We finished if and it was around 10:30 or 11:00 A.M. Clarence came over and told us it looked good and we could go home. That is when Gary and I left, I do not know when Clarence and the other two left." [Sic throughout.]

Nowhere, in this statement does Sessums say that he heard a girl scream "no" and "don't"; nowhere in the statement is there any indication that another person other than the janitors may be involved; and nowhere in the statement is there any indication that Acreman is involved, yet these events, if true, would be highly significant. Regardless of how the walk-through was conducted, it would be impossible for it to have generated such blatant inconsistencies.

---

2. Sessums's testimony at the first of applicant's two trials and at the first writ hearing was consistent to that of his initial statements to police. Keeshan testified at the second writ hearing, however, that he did not use Sessums as a witness at the second trial because at applicant's first trial (which resulted in a mistrial when the jurors were unable to agree on punishment) Sessums became "confused" on cross-examination and would "testify in every direction." Apparently defense counsel concurred in the District Attorney's assessment of Sessums as a witness. The trial record makes it abundantly clear that Sessums was presented to defense counsel to call on applicant's behalf but that applicant declined to do so. It is ironic that the majority now accepts Sessums's second writ testimony as credible but turns its back on all former testimony.

Moreover, the majority fails to consider that none of the other janitors who gave written statements to the police prior to Styles's involvement implicated Acreman, yet if Sessums's story were true, the events that he now says happened would have taken place when all janitors—including applicant who did not participate in the walk-through—were together. It is surprising that the majority has failed in its rendition of the facts to include applicant's testimony, but applicant, accompanied by his lawyer, testified during the grand jury proceedings as follows:

"Q. Why were you going to put [toilet paper] into the boy's restroom, had you already checked the other one?

"A. No. I—there was a lady had already went up there—she took the paper up there. She came back and I was on my way back.... That's when I met all of them. They were standing....

[Questions and Responses regarding the girl who took toilet paper into the restroom]

"Q. How did you come to talk to her?

"A. She was standing in the hallway when I asked the coach about [the toilet paper] and I asked her would she run up and check that one and then I left and went back up and this is when Ackerman, Sam, Henry Peace and John was all standing. I told them, "let's go across the street" and I sent them over across the street and I said I'll be right over."

When asked if he had seen any other person in the main building around the cafeteria, applicant responded that he saw a young man and lady. Applicant also testified that he saw no other black males in the building that day, no school personnel and no other custodian. Asked if he had seen anyone else, applicant testified, "Nobody else." Thus, *even applicant* did not implicate Acreman or anyone else in either his affidavit to police or in his testimony before the grand jury. Moreover, and what the majority has conveniently ignored, applicant, himself, exculpates the other janitors at the school on the day of the murder. The following colloquy occurred during the grand jury testimony:

"Q. You don't believe any of the other custodians did it?

"A. Not after the experience I've had with them. They don't seem to be the type of person that would do it.

"Q. Would they have had the opportunity to do something like that?

"A. No.

"Q. You didn't know of an opportunity that they would have had to do it?

"A. No, sir."

In addition to his grand jury testimony, applicant executed an affidavit on August 23, 1980, concerning the events that occurred on the day of the murder. The events as outlined by applicant fail to support even remotely Sessums's account of the events.[3] Therefore, if we accept the majority's conclusions that the walk-through generated false testimony we

---

**3.** Applicant's sworn statement to police is as follows:

"Beverly Dupre brought me to work a 7:40 A.M., Ackerman, Sam, John and Henry Peace were already at the school when I arrived. I opened the doors and let them into the cafeteria, and then I showed them what I wanted them to do. I then went into the gym to unlock the doors and take out the trash, then I left the alan wrench with the coach in charge of volleyball team so she could lock doors. Then I went to the Shamrock Station and bought me some cigarettes. Then I came back to the girls gym and asked the coach if the bathrooms have paper and then I left and went back to the front of the building. I sat

down and waited for the guys to finish cleaning the cafeteria. When they finished with the cafeteria, I sent all of them to the vocational building across the street to set up 85 chairs for Monday and I went to put toilet paper in the restrooms. Then I went across the street and the guys finished putting up the chairs. I then told John, Ackerman, and Sam that they could go home and Henry and I went back to the main building to lock up cafeteria. We heard some girls calling for someone and they told us that one of the girls was missing and they were looking for her. I told Henry that we needed to check all doors and make sure they were locked. Henry and I started checking the doors and it was then we discovered that the auditorium door was

must also accept that the other janitors, *including applicant,* gave false statements in their initial reports to the police and that applicant lied in the grand jury proceedings. It is far more likely that the passing of nine years is responsible for changes in Sessums's account of the incidents at the school, not the investigative procedures utilized by Styles. Indeed, Sessums testified at a prior writ hearing on August 18, 1986. At that time the only significant change in his account of the events was that he saw Acreman talk to a girl as she entered the restroom. None of the events that he now claims to have happened are included in his testimony at this hearing.[4] Again, the majority errs in accepting the habeas court's findings of fact, such findings regarding John Sessums are clearly erroneous and should be rejected.

The majority also claims that Acreman may have given false testimony due to the walk-through. The majority is willing to place its faith in a video taped interview of Acreman that was admitted into evidence at the writ hearing. In the taped interview, Acreman implicates another person, James Dexter Robinson, as an assailant. The majority opinion, however, fails to relate how that interview occurred, to wit: Richard Reyna, a private investigator for applicant, testified that before he began his interview he told Acreman that there "was a new eye-witness account that was putting him ... and James Robinson on the landing with the girl and that there had been trouble." Further, Reyna told Acreman: "You don't need to take the rap for anyone.... I fed him this ... I said the girl was being grabbed and she was yelling for help.... Then I told him that James Robinson had run upstairs from the water fountain. I said we know that."

At the writ hearing, Acreman recants what he told Reyna on the video tape and testifies that he was "scared into telling what was said."[5] Also at the writ hearing, the habeas court judge entered a finding that "[b]ased upon Gary's Acreman's answers to questions and his countenance during the many hours that he was on the witness stand, this court finds that his testimony at the evidentiary hearing was incredible, untruthful and generally not worthy of belief."[6] When the majority relies upon the video taped interview of Acreman

open. We went inside the auditorium and started looking around. Then we discovered that the back door of the auditorium was open. We went on to the stage and cut the lights on so we could see. I then told Henry to look up around the stage because sometimes the kids would hide in there. Henry and I were looking up on the balcony behind the stage because the kids sometimes get behind the boards and hide. Then Henry moved this sheet of plywood and called me and I went over there and saw the girl lying there. I then checked her pulse and found no pulse. I then went and got one of the Police Officers and showed him where the body was."

4. A video taped interview of John Sessums by applicant's attorney was admitted into evidence at the writ hearing. In it Sessums appears to be intoxicated and must be coached into describing events and persons. For example, before Sessums is able to identify Robinson he must be shown a photograph. Even after being shown a photograph, Sessums is unable to name Robinson and must refer to him as the man with no teeth.
One of applicant's own witnesses testified at the writ hearing that Sessums is an alcoholic.

5. When Reyna was asked about his investigative techniques in securing Acreman's and Sessums's stories, he related, "My tactics were not any different than tactics applied by your officer of any other police agency. They are the same." Thus, the majority would have this Court find that when a Texas Ranger conducts an investigation that utilizes certain techniques it produces false testimony, when, however, applicant's investigator utilizes the same techniques it produces reliable information.

6. This one finding by the habeas court is not clearly erroneous. Three witnesses who testified on behalf of applicant at the writ hearing, stated that Acreman had told them that he knew who had committed the murder. Each witness, however, testified that they did not believe Acreman when he told them this. One of these witnesses testified that Acreman was a "nut, a kook," and appeared to be drunk when he said this. Another described Acreman as "always acting big."

to suggest that false testimony was elicited at applicant's trial, the majority relies upon unsubstantiated hearsay by a man called unworthy of belief by the habeas court judge and whose out-of-court statements are contrary to applicant's grand jury testimony. That is, asked if he had seen anyone else at the school on the day of the murder, applicant testified, "Nobody else." This is significant since Acreman places Robinson with the girl at the top of the stairs leading into the bathroom. It is unrefuted that this is at a time when applicant and the four other janitors are together. Again, if the Court accepts the habeas court's findings this means that applicant perjured himself in the grand jury proceedings. The more appropriate response to the habeas court's findings concerning Acreman's out-of-court statements would be to reject them. They are clearly erroneous.

The habeas court finds and the majority blindly accepts that another janitor, Sam Martinez, had changed his rendition of the facts due to the walk-through. Again the majority ignores the record. Martinez gave the following statement to police prior to the walk-through:

"Went to work around 7:35 A.M. in cafeteria to put table and chairs in cafeteria. Finished in cafeteria sometime between hour of 9:00 A.M. and 9:30 A.M., not sure when. Next went to look for Clarence, found him coming up stairs with two rolls of paper. Then saw blonde-headed girl go to the girl's restroom. She had on blue jeans, medium hair. Next we asked Clarence what to do, he told us to go across the street to the Vocational Building. We did, and then we waited about 30 minutes before he came out of the main building and called to the short man to come to get the key to the building. Then we set up chairs there, we finished this, then he came and told us that we were finished, which was about 11:00 A.M. or little after."

Admittedly, Martinez's second statement, made after the walk-through is more thorough and includes a time reference that is not in the first statement but, as Judge Campbell has indicated, there are no significant discrepancies between the two statements. Moreover, the majority fails to understand that those facts that have been added are easily verifiable. That is, additional facts are added to Martinez's second statement, but these facts for the most part relate to where Martinez was during the time that the event occurred. For example, in the first statement, Martinez relates that, "Next went to look for Clarence, found him coming up stairs with two rolls of paper." In the second statement, this becomes:

"Then Gary, John, and I came out of the cafeteria through the same door as we had entered, and walked on down the hallway of the Auditorium area to wait for Clarence to give us our next assignment. We waited in the hall just a short way from the stairs that lead up to the choir room. There were two restrooms at the top of the stairs.... Clarence came up the stairs from the gym and was carrying toilet tissue. He started on up the stairs toward the restroom...."

Comparing the two statements it is obvious that the only significant difference between the two is that in the second various locations are added. These locations are easily verified by looking at the map of the school contained in the statement of facts from the trial. For the most part, this is true with the additional facts that have been added to the second statement.[7] The majority's reliance upon the habeas court's findings regarding Martinez's statements is wrong as these findings are, again, clearly erroneous.

The majority next attacks the testimony of Henry Martin Peace. Peace testified for the State at both of applicant's trials. Peace's testimony implicated applicant be-

---

7. Judge Campbell has included in his opinion the first and second statements taken from Martinez, Sessums and Acreman. As is the case in Martinez's second statement, both Sessums's and Acreman's second statements merely include various locales that are easily verifiable.

cause Peace consistently stated that applicant told him to check the loft area in the auditorium on three occasions during the search for Cheryl Ferguson. Ms. Ferguson's body was eventually discovered by Peace in the loft area. The majority implies that Peace's story was a result of Ranger Styles's coercion of Peace. Again the majority has placed its reliance upon the habeas courts' findings and again the majority's reliance is misplaced.

In recounting the evidence that Styles had forced Peace against a wall, choked him with the chain around his neck and threatened to blow his brains out, the majority ignores the fact that Styles had focused on Peace as a suspect and was not attempting to influence Peace's testimony regarding *applicant's* activities on the day of the murder. Peace's testimony bears this out:

"Q. [by Judge Pickett] Are you under any kind of fear from anyone or intimidation?

"A. Well, the only person I'm not too sure about is Wesley Styles because he did come out to my house which I'm going to have to testify under oath, he did come out to my house, roughing up or standard police procedure, but he did get me by the shirt. I don't know whether you call it shoving me, pushing me or however. But he did put me up against the wall and took everything out of my pocket. He kept telling me I killed the girl."

The record, however, is devoid of *any* attempt by applicant to link the mistreatment of Peace to any fabrication of Peace's testimony regarding applicant. The majority seems to infer that applicant has standing to complain about Peace's potential due process violation and thereby bootstrap himself into the same position as Peace. The majority does not cite one case supporting this proposition nor do they show in any manner whatsoever that Styles treatment of Peace influenced his trial testimony one way or the other.

In addition, the majority attaches significance to Peace's treatment by the District Attorney's office when Peace complained of Styles's activities. Peace testified that members of the District Attorney's office told him he was "hallucinating" the incidents regarding Styles. The majority again fails to link the treatment of Peace to any falsified or tainted evidence that affected applicant in any manner whatsoever. Applicant's implied argument would have this Court accord applicant standing to benefit from the alleged wrongdoing that Peace suffered and the majority opinion gives tacit approval to this new found judicial concept of standing by inference when discussing Peace's assertion that he would have preferred one of his relatives read his statement back to him. Peace was not able to read without assistance. Peace testified:

"Q. [By counsel for applicant] Did the police take a statement from you shortly after the murder?

"A. Yes, sir, they did.

"Q. And did they write up that statement?

"A. They wrote something on a piece of paper you have. I have no idea what it was.

"Q. Did you request any aid in the reading of the statement?

"A. Yes, sir. I asked for my sister or brother-in-law to be able to be there so he could read it to me. He said it wasn't necessary.

"Q. Would you have trusted your sister or brother-in-law to read it correctly to you?

"A. Yes, sir.

"Q. What were you told by the police when you requested your sister or brother-in-law to read the statement to you?

"A. Well, they just told me it wasn't necessary.

"Q. Did you believe that you would be able to leave if you didn't sign the statement?

"A. Well, they told me I would have to sign it before I could leave.

"Q. And did you try to place a call to any either your sister or brother-in-law?

"A. I wanted to but they told me I had to stay there until they got through with the statement.

"Q. *Now, Mr. Peace, did you meet with a Texas Ranger by the name of Wesley Styles?*"

The majority's argument seems to follow along the lines that since Peace was not granted his request for reading assistance that his statement was false. Yet note the last line of emphasis in the replicated testimony. Applicant's counsel never asks if the statement was inaccurate. Applicant's counsel hops to a new topic and never broaches the consequences of Peace's denial to pick the reader of choice for his statement. Why? Because the record is abundantly clear that when it comes to the events at the school on the day of the murder, Peace's testimony has not changed significantly as it relates to applicant's involvement. Even applicant's investigator, Richard Reyna who testified at the writ hearing, indicated that Peace has remained unwaivering in his account of the events at the school on the day of the murder. Peace testified to the following at the second trial:

"Q. [questions by Morris, counsel for applicant] Now, how many statements did you give in this case, Mr. Peace?

"A. I've only given one.

"Q. You've only given one statement. And when was that statement?

"A. That was on Saturday that girl got killed.

"Q. On the 23rd day of August?

"A. Yes, sir.

"Q. And I know that you can't read or write, can you?

"A. No, sir. I can't.

"Q. Did somebody make this statement up and read it to you?

"A. I went to the police station with a police officer. He sat there and wrote it up on a piece of paper and then he read it back to me, and then he went and had it typed up and then they read it back to me again. And I initialed it."

Thereafter, Peace's testimony is consistent with his statement to authorities.

Further, the majority misstates the record when they write that Peace was not allowed to leave the police station until he signed a written statement. Peace stated that he wanted to place a call to relatives but the police officers told him he had to stay until they got through with the statement. This is a far cry from the majority's attempt to color this testimony as representative of improper police activity. The majority's and the habeas court's incomplete reading of the records in this case leads them to a result not even remotely supported by the evidence. Applicant has failed to show the harm *he* suffered as a result of the interplay between the authorities and Peace and, indeed, applicant is incapable of showing such harm since Peace has adhered to his trial testimony regarding the events at the school.

Last, the majority points out that Peace was told that the "nigger was elected" [referring to applicant as suspect] as perpetrator of the crime because of his size and apparent strength. Aside from the odious nature of the racial epithet the majority has failed to show why applicant would not be elected as the prime suspect in this crime. Negroid pubic hairs were found in the vaginal area of the victim and applicant was the only Black at the school on the day of the murder. Further, applicant was the only janitor whose time was unaccounted for during the critical period after the victim disappeared. The victim was seen near applicant soon before her death. The strangulation marks around the victim's throat were consistent with having been made by applicant's belt. Applicant was the only one of the janitors with keys to the auditorium and in his statement to po-

lice he indicated that he was aware of the loft area. The majority, however, reasons that the presence of a racial slur in and of itself can exonerate applicant. There is no legal support for the majority's proposition that the utterance of a racial epithet applied to a suspect constitutes grounds for a due process violation when the facts clearly point to that person as being the culprit.

The majority finds another due process violation because authorities failed to follow leads that may have been inconsistent with applicant's guilt. Again the majority can cite no relevant authority but has determined that the facts developed at the writ hearing support this conclusion. Again the majority errs in following the habeas court's findings.

The majority writes that Texas Ranger Styles maintained a blind focus that applicant had committed the murder and points out that a Caucasian pubic hair was found near the victim's vagina.[8] The majority, taking Styles's testimony out of context from the writ hearing, quotes him as saying, "Let's say I didn't do it and it wasn't done and why it wasn't done, I don't know," as being responsive to the question of why hair from the other janitors were not compared with the Caucasian pubic hair. The majority ignores that Styles at the writ hearing testified that, "I assure you, during my investigation, if it had been anyone connected with Clarence Lee Brandley or other than him, he would have been charged with it, sir." Styles further testified that the janitors alibied each other; this is supported by the testimony given by the janitors at trial and by applicant himself, who in his grand jury testimony, indicated that the other janitors would not have had the opportunity to have committed the murders. Upon cross-examination, applicant's attorney asked Styles:

"[I]f you look back on it now twenty-twenty vision and it's not fair to you, I don't suppose, to point out things that have come up since you concluded your investigation, but if you look back, don't you think it would have been the prudent thing to do at least take samples of the other janitors' pubic hairs ...?" Styles answered, "[I]f you say it's a good idea. I'm going to agree with you." Applicant's attorney, then responded, "No, I want you to say it." Styles response was, "Let's say I didn't do it and it wasn't done and why it wasn't done, I don't know." When the majority repeats this answer in the opinion, it ignores first, the answer is taken out of context and is only indicative of what Styles would do nine years after the initial investigation when one of the janitors has altered his story of events and second, it ignores testimony by Styles that he did not investigate the other janitors because they were able to alibi each other. Certainly, that others were not investigated because they indicated that they had been in each other's company during the murder was a reasonable action on the investigator's part. The alternative would be that all the janitors, including applicant, were covering up for the killer or killers, as such, Styles properly centered his investigation upon applicant, the only person whose presence was unaccounted for during the time that the girl would have been killed.

Moreover, the majority asserts that the State should have investigated the other janitors because the blood on the victim's blouse was type A and it could not have come from the victim because she had not been cut in the upper areas of her body. This is wrong. At trial, Pat Lux, the chemist who conducted the examination of the items sent to her by the Conroe Police

8. This is not altogether correct. The testimony at trial by expert witnesses was that the Caucasian hairs found near the victim's vaginal area were "possible" pubic hairs, and, unlike the Negriod hairs, these Caucasian hairs had not been forcibly removed.

Further, the majority conveniently ignores that authorities had taken pubic hair samples from Peace to compare with the hair found on the victim. The majority also conveniently ignores that at trial applicant's self-chosen expert testified that the Caucasian hair found on the victim did not compare favorably to those of Peace.

Department, testified that she did not examine the blood on the blouse. The following colloquy took place:

"Q. So you made no effort at all to determine from testing that blood stain what type [of] blood that might have been ...?

"A. Okay. I couldn't have gotten an enzyme from that stain. That stain was too weak....

"Q. But you could have determined whether it might have been A or B or O type blood, possibly, right?

"A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. [Y]ou attempt to determine things that might be important as evidence in a court of law, don't you?

"A. Yes, sir. But these items were all packaged together in one package, the blood stains from the socks and from the panties. It's hard to say if that blood stain came from these socks that were packaged in there...."

In short, the blood on the blouse could have come from the other bloody items found in the plastic bag. Indeed, all physical evidence was turned over to an expert chosen by applicant to conduct his own analysis, and even applicant's expert failed to examine the blood spot. What the majority fails to relate in its facts, moreover, is that the blood on the blouse was examined during the trial. Moreover, it is significant that the majority opinion fails to include in its rendition of the facts that Peace's blood *was* taken and inspected for comparison. That blood from the other janitors (who along with applicant in his grand jury testimony, had alibied each other during the critical time) was not taken for examination was again a reasonable action on the part of investigators. There is absolutely no due process requirement that investigators exclude beyond any reasonable doubt other possible suspects. Here the other suspects were eliminated by the State because they were in each other's company—nothing

more is required on the State's part to conform to due process requirements.

The majority also faults the State for its failure to maintain vaginal swabs for further analysis. It should be emphasized that there is absolutely no showing that the swabs were discarded in bad faith by state agents; no such finding was made during the writ hearing and no such finding is even remotely supported by the record. Moreover, the record clearly indicates that at the time that the swabs were analyzed, state agents followed routine procedure in maintenance and examination of the swabs. Dr. Joseph Jachimczyck, the Harris County Medical Examiner, testified at applicant's second trial as follows:

"Q. And in the case of a murder, or homicide, committed in the course of rape or attempted rape, what is the normal procedure for handling vaginal smears, swabs, washings, stains, that sort of things?

"A. Well, we obtain the specimen and I turn them over to my chemist-toxicologist and I request the particular examinations that I want performed, and then he performs them for me and reports his results to me. Once we've completed our examination, we've either consumed the specimen, depending on the particular determination or we discard it after we've gotten the information that we needed.

"Q. Now in the case of a requested autopsy from another county, do you normally just perform the autopsy, and then turn over to some officer or authority from that other county, those vaginal swabs, washings, etc.?

"A. No, the usual procedure is I handle it like I do anyone of my own cases, except if specifically requested by another agency. Then I will provide them with whatever samples they would like to have. If for example, they want a sample of blood, I'll give them a sample of

blood. If they want to have their own independent smears, I'll make those available. I'll give them a set of smears, but we do our own in our lab. We don't send them off anywhere.

"Q. Well, do people pick up those samples frequently and send them off to another lab, such as the Department of Public Safety lab?

"A. No, sir. Not at all frequently. No.

"Q. But they do sometimes?

"A. Yes, on occasion it is done.

"Q. Now, are those vaginal swabs, washings, etc.—do they have any purpose or use in identifying an attacker?—helping to identify the attacker?

"A. They may. There's a limited use for them. Not so much identifying the attacker, but rather excluding a suspect.

"Q. Because—isn't it a fact that the running of those liquids—or the examination of those liquids could never in any case than you can imagine identify any one single person as the person that did it?

"A. Not to my knowledge.

"Q. But it can identify a segment of the population that could have done it and exclude another segment of the population, that could not have done it.

"A. That is correct.

"Q. For instance, I believe you determined in your testing that Cheryl Fergeson had A-type blood?

"A. Yes, sir.

"Q. And you didn't do any further testing to try to determine the blood type of the donor of any of the liquids or semen that you found in the area of the little girl's body?

"A. No, sir.

"Q. And is it my understanding that you keep some of these for up to thirty days and then throw them out, because you don't have room

to store those things for more than thirty days?

"A. Yes, sir.

"Q. And in this case you made no—you didn't try the blood type of those semen samples that you found?

"A. No, sir.

"Q. Would that have been possibly useful in excluding certain individuals?

"A. If they were secretors, probably yes. If they are not secretors, probably no.

\*    \*    \*    \*    \*    \*

"Q. But is it your testimony that none of those tests were run with regard to the vaginal swabs or stain washings or vaginal washings in this case?

"A. I did not do that. That is correct.

"Q. Doctor, did you store any of those solutions, containing semen for any period of time, to your knowledge?

"A. No, sir. I have been informed by my staff that a request was made sometime during the middle or latter part of the week of the autopsy, the autopsy being Sunday, and at that time, there were no swabs available. There was blood available, which was turned over to the Department of Public Safety lab.

"Q. Doctor, you'll probably recall a conversation with me, when I called with regard to the possibility that you might have such samples available. Do you remember that?

"A. I remember that, now that you remind me. We did not have it at that time.

"Q. Right. That was sometime up in the first or second week of October after we got your autopsy report.

"A. Yes, sir.

"Q. I believe you stated that you wouldn't have them in any event, because it had been longer than thirty days?

"A. That's right. Thirty days is generally a maximum that we would have normally kept them.

"Q. Well, Doctor, did you have enough from the washings of stain in the groin area, and any washings or swabs from the vaginal area to have gone further and tried to blood type those liquids and run ABO or PGM, esterase, or any of those other tests?

"A. We did not. No, sir.

"Q. You didn't have enough?

"A. No.

"Q. So, you didn't even have enough to blood type it?

"A. That's right.

"Q. What did you use the samples that you had for? What did you do with them?

"A. Ran the acid phosphatase reaction.

"Q. Was that—

"A. And then they were discarded.

"Q. Well, you mean the samples were discarded, but did you have enough to proceed further and attempt to blood type the semen?

"A. No, not at the time we had the smears. These were only smears. They were not actually liquid. They were just a smear. The smears and the swabs. The wet swabs and the washings that we had we utilized that. That was consumed during the process of checking for the acid phosphatase.

"Q. Do you use a saline solution to wash the stain?

"A. Right.

"Q. And there was no way that you could have gone any further and run any tests?

"A. Of, if we were set up to do it, we could have, but we didn't feel the need for it at the time.

"Q. Well, if you were set up—I'm sorry, I don't believe I understand.

"A. If we were set up for it, I've since learned that the Department of Public Safety is set up to do this kind of sub-testing that you're describing.

"Q. You're not set up in your lab that you can run those particular tests?

"A. No, sir.

"Q. Well, so would it be correct to say you might have had enough, but you're just not set up to run all them?

"A. Both are correct. I did not have enough fluid, and I was not set up to run them either.

"Q. Well, were—

"A. —But even if I had the specimens, we couldn't run them. There wasn't enough fluid there.

"Q. Were any requests made for those fluids from the lab—

"A. As I say—

"Q. —at the time of the autopsy?

"A. —No, not at the time of the autopsy. I turned over whatever was requested at the time of the autopsy, and I've indicated here what those items were.

"Q. Was Captain Monty Koerner present during the autopsy?

"A. Yes, sir.

"Q. Is he chief of detectives for the Conroe Police Department?

"A. I don't know his specific title, but he is with the Conroe Police Department.

"Q. Did he request those items from you that you gave him?

"A. Yes, sir.

"Q. He requested the items that you gave him, such as the particles of dirt and hair and those other things?

"A. Yes, sir.

"Q. Did you have any conversation with him with regard to whether or not you were going to try to blood type the semen samples or run those sub-group tests?

"A. I don't recall, but I told him we were going to do our usual procedure, namely the acid phosphatase and the microscopic slide preparations.

"Q. Well, quantitatively, how much of the seminal solution do you need in order to run the acid phosphatase test?

"A. About a CC.

"Q. Okay. About a CC, but that is a very dilute solution, isn't it?

"A. Right.

"Q. And in making washings on the groin area, how much liquid or solution did you end up with following the washing?

"A. I don't remember exactly how much, but not too much, because we didn't want to dilute that stain any further than what was necessary to do the test.

"Q. Now, I believe that you said that you took a swab from the vaginal area?

"A. Yes, sir.

"Q. Is that a wet cotton swab?

"A. Well, it was dry when we started, and it became moist, when we got the specimen.

"Q. Okay. And then you made a smear on a slide?

"A. We made two—two smears each from the mouth, vagina, and rectum on the microscopic slides and stained those to demonstrate the presence or absence of spermatozoa.

"Q. Okay. And upon taking vaginal swabs and making the microscopic slides, could you have taken the semen or fluid that was left in the cotton swab and made a solution of it and run some tests?

"A. I suppose that could have been done.

"Q. But that was not done in this case?

"A. No, sir.

"Q. Well, is it possible there would have been enough upon taking the swab and washing the swab out and making the solution that you could have blood typed it?

"A. It's always possible. It depends on the concentration of the fluid itself. And it depends on the amount of enzymes and the heaviness of the smear, and the—whether the person is a secretor or not. There are a number of variables that—but, as far as is it possible, yes, I would say it would be possible.

"Q. So you don't know whether there was or there wasn't enough on the swab to run those blood tests?

"A. The swab looked awful dry to me. That's all I can say."

Dr. Jachimczyk's testimony on direct examination at the writ hearing is as follows:

"Q. All right. In the autopsy of Cheryl Fergeson, did you obtain what is commonly referred to as a cotton swab of the vagina area?

"A. Yes, sir.

"Q. And the purpose of that is what?

"A. Well, the purpose of obtaining the cotton swabs is to check for the presence or absence of any spermatozoa or if the presence or absence of any seminal fluid in the form of the enzyme, the acid phosphatase which was a component of seminal fluid.

"Q. In this particular case, where it was reported to you I suppose a suspicion of rape and murder, were you looking for evidence of spermatozoa or semen?

"A. Well, in view of the injury that I saw on the body, of course, I was suspicious of rape being a component in this particular death; therefore, I did my customary examination.

"Q. And doctor, when you find spermatozoa or evidence of spermatozoa or semen in the vagina, is it collected on a cotton swab?

"A. Yes, sir.

"Q. Did you do that in this case?

"A. Yes.

"Q. Did you collect spermatozoa and semen on the cotton swab?

"A. Well, actually I collected the—

"Q. Fluid?

"A. Not really. There wasn't any fluid as such. We just took a smear, literally, of those portions of the body, that is, the vagina, the rectum and the mouth and we also took a washing of a stain that was present in the left groin.

"Q. All right. Now, do you preserve or, take it back, do you know whether or not you personally gave the cotton swabs to Detective Koerner?

"A. I don't remember precisely whether I did or I did not.

"Q. And is there any written memo, have you searched your file to see if there's any written memo or such that would say what actually happened to the cotton swabs?

"A. No, sir.

"Q. Now, about a week after Monty Koerner was in your office for the autopsy, were you contacted by a Mr. Wesley Styles?

"A. I don't remember that I was.

"Q. Do you have any present recollection of whether or not the cotton swabs were given to either Monty Koerner or Wesley Styles?

"A. I do not recall at this time, no, sir.

"Q. Do you have any recollection or written memorandum that would say that you destroyed the cotton swabs?

"A. No, sir.

"Q. Dr. Jachimczyk, is it possible in your understanding of the heart of forensic medicine, that you can determine the blood type of the donor of spermatozoa or semen if that person is a secreter?

"A. If he is a secreter and if there's enough material there to examine, yes, that can be done.

"Q. Now, who calls the shots, Doctor? Do you decide what test you're going to run or does the police depart-

ment or the agency that retains you decide what tests are going to be run on any evidence that you have?

"A. Well, in so far as cause and manner of death is concerned, it is my decision. I do any and all necessary tests to determine the exact cause and manner of death. In so far as any evidence, where it concerns additional police investigation, I do not call the shots.

"Q. That would be done then by, in this particular case, either Monty Koerner or the Conroe Police Department or Wesley Styles of the Texas Rangers?

"A. Well, I can't say for sure whether in this particular case, but in general, that's the way it's done.

"Q. Do you have now, Doctor, the cotton swabs?

"A. No, sir.

"Q. You have searched your file and are relatively certain that they do not exist, at least in your office?

"A. I'm positive they don't exist.

" * * * * "

*Cross–Examination by Mr. Speers:*

"Q. Dr. Jachimczyk, does your office or at least let me ask you with reference to your procedures back in August of 1980 when this autopsy was performed, did your office perform as a routine course or for that matter at any time blood grouping analysis of seminal fluid?

"A. No, sir.

"Q. Normally, in that situation if you've been able to recover some by cotton swab or whatever method though would be submitted to the D.P.S. Laboratory or to someone like that by the agency that was investigating the case?

"A. Well, we were not involved in that at that time. We did do a blood group but on the blood, not on the swabs themselves."

We were not even attempting that, no.

"Q. The whole purpose of your either the taking the swabs and taking the washings, all that was just to determine whether or not there was either spermatozoa that you could see under the microscope or if not, seminal fluid as revealed by the presence of acid phosphatase; is that correct?

"A. Yes, sir.

"Q. So whatever tests you did not perform in the first instance for the purpose of subsequent testing to come up with blood group of the donor, wouldn't it?

"A. That is correct, yes, sir.

"Q. As I understand it, just to make it clear, as to the swabs that were taken by you or under your direction at the time of autopsy, the bottom line is you don't have any idea what happened to those. Is that correct? Or do you have some idea what happened to them eventually?

"A. *The ones that we did our examination on were discarded.*

"Mr. DeGeurin: Your Honor, I'm going to have to object. First of all, make sure this is not from hearsay at this time, and ask that the answer be stricken until it's demonstrated it's not from hearsay.

"The Court: Rephrase your question, Mr. Speers.

"Q. (By Mr. Speers) Obviously you used—As I understand, there were two things done, there was some swabs taken, also some smears taken on microscope slides; is that correct?

"A. The microscope slides were prepared from the same swabs.

"Q. Okay.

"A. And then first the slides were prepared, literally smeared on a slide and then the residue is treated with a chemical and tested for the presence or absence of acid phosphatase reaction.

"Q. And after you, the swabs were used to perform that test, the acid phosphatase tests, you shucked them in the trash when you completed that test; is that right?

"A. *Not immediately. We discard them—Now we keep them six months, but at that time, we kept them on the average of a month or less.*

"Q. So in terms of would you have used up all the swabs that were taken performing the acid phosphatase test or other tests?

"A. Yes. Well, the swabs would still remain but the acid phosphatase would no longer be demonstrable because whatever was there will have been in a sense consumed during the process of the testing, the chemical reaction, in other words.

"Q. I guess the bottom line question, I don't know what the answer to this is, but would the swabs that you took and at any point after you had performed the test, would they have been of any use to your knowledge to anybody in making further studies as to the blood group analysis of the donor of the sperm?

"A. No, sir. No, sir."

\*     \*     \*     \*     \*     \*

*Redirect Examination by Mr. DeGeurin:*

"Q. Doctor, I understand that when you make a—you take the cotton swab and rub it across a piece of glass on a slide to make a smear and from that smear you determine, you treat it and determine if there's spermatozoa or sperm? Or semen?

"A. No. The slide has first got to be stained and whatever cells are on the slide take up this stain and then we can look for and do look for the presence or absence of stained spermatozoa.

"Q. But you actually see it through the microscope, correct and, identify it?

"A. Oh, yes. You can't see that with the naked eye, no, that's for sure.

"Q. Now with the cotton swab you had used to smear the stain, that cotton swab is kept now six months and back then for a period of time; is that correct?

"A. Yes, sir.

"Q. And it's on that cotton swab would be traces, would it not, of actual fluid of some sort donated by the person who raped Cheryl Fergeson? Isn't that correct?

"A. Run that by me again, sir. I didn't understand your question.

"Q. The cotton swab that comes from the cavity of Cheryl Fergeson, the person you did the autopsy on?

"A. Right, yes.

"Q. You take that cotton swab, you rub it across the piece of glass for the test you're performing to determine if there is spermatozoa or semen?

"A. Well, spermatozoa, you can't tell semen on that at that point, only if the sperm are there or not.

"Q. Then after you have done that, you still have the cotton swab, do you not?

"A. Right.

"Q. And on that cotton swab is fluid donated by the attacker?

"A. Right.

"Q. Now, in the present art, are you aware of that from those cotton swabs, even without refrigeration left in a file cabinet drawer, then years later, a DNA molecule can be obtained and can identify like a fingerprint the person who actually did the rape?

"A. Well, I'm not sure of the accuracy that you point out.

"Q. Have you heard about the process?

"A. Not until I got the Court order that you requested.

"Q. And you are aware, aren't you, Doctor, that from the fluid that is left or substance that is left on the cotton swab through washings or whatever is necessary, you can obtain something from which with the proper methods the blood type of the donor of that spermatozoa or semen, you can determine the blood type if that person was a secreter?

"A. Yes, sir, providing that it was not subjected to any other chemical reaction.

"Q. Now, the cotton swab, did you stick it in some kind of chemical reaction?

"A. Yes.

"Q. How many cotton swabs were there?

"A. I don't understand—how do they work? There is a color reaction.

"Q. How many were there?

"A. Of, there are two.

"Q. Did you personally throw them both away?

"A. Now, wait just a moment. No. No. From where now are you talking? We had one from the mouth, one from the vagina and one from the rectum, so we had three.

"Q. All right. And all three of those cotton swabs are missing?

"A. All three of those, yes, they're no longer available, that's true."

Thus, the swabs were discarded after the analysis was conducted upon them per the standards utilized at the lab at that time. The majority's reliance upon testimony indicating that the present procedure, utilized by investigating authorities, is to maintain the swabs, is misplaced. What the current procedure is today—in a world where technological advances in forensic science are commonplace—is immaterial. In addition, nowhere in the record is any bad faith imputed to Dr. Jachimczyck as a result of the laboratory guidelines he followed at the time of the Ferguson autopsy. The majority is wrong when it judges the nine year old procedures under today's standards.

The most tenuous argument advanced by the majority is that regarding the State's failure to investigate a lead by Cheryl Bradford. Supposedly, Bradford saw two men rushing through the gym around the time of the murder. She told this to her coach who in turn told the Conroe Police Department.[9] The majority faults the State for its failure to investigate further. The majority errs considerably. The Conroe Police questioned every girl participating in the volleyball tournament along with the coaches and staff. No other person interviewed verified Bradford's statement. An officer with the Conroe Police Department, who had interviewed each of the girls at the school, testified at trial that at that time "the gym was quite full" and that in attendance were men as well as boys. Thus, the majority would have the police investigate an unsubstantiated statement made by only one of several people interviewed that she saw two men in an area where police had seen several men. Certainly, this is an unreasonable requirement on the majority's part.

The majority finds Bradford's statement to be significant because, according to the majority, Bradford suffered "chills" when she saw a televised picture of James Robinson. The majority is taking Bradford's statement out of context and the habeas court and the majority completely miss the mark on this point. Bradford, at the writ hearing, testified:

"Q. [by Mr. Speers] Now, when you were watching *60 Minutes,* was there anything you saw on *60 Minutes* that caused you to make phone call to the authorities?

"A. Well, I was sitting at home that afternoon, watching *60 Minutes* and I was probably grading papers or I don't know, doing something, and anyway, we really wasn't paying attention to it and they said Clarence Brandley and they said

Conroe High School and so I Started watching it. And all of a sudden they showed—they showed a guy on the television with kind of dark hair. I don't know if it's, if I recognized the guy, which I doubt I did because like I never saw the guy way back then face on, but I don't know if it was me recognizing him or just the thought of everything again that made me—I just got chills all over. I couldn't sleep that night so the next day, I had called one of the other coaches I worked with. I had told her everything. So the next day I called Conroe. I told them, you know, that I had—I was there when it happened and just made me call them again.

"Q. Then did you this statement to an investigator form the Attorneys General's Office?

"A. Yes.

\* \* \* \* \* \*

"Q. [By State's Attorney] Mrs. Bradford, just to make it clear, in fact, you can't tell us that the person that you saw or one of the people that you apparently saw inside the gymnasium was the person whose picture you saw on *60 Minutes*?

"A. No, I can't."

Absolutely no basis exists for the inference that Bradford got the "chills" because she recognized Robinson from the televised photograph. The majority's requirement that the police officers investigate Bradford's statement further is completely unreasonable—the lone statement is not only unsubstantiated by other witnesses at the scene, it is of little probative value in inculpating Robinson and is of no value in exculpating applicant. As Judge Campbell aptly concludes, that other persons may be implicated in the murder in no way disproves

---

9. There was no evidence introduced at the writ hearing that the police actually received this information and that it was relayed to those investigators concerned with applicant's case. The prosecutor testified at the writ hearing that he was unaware of Bradford's statements.

applicant's guilt.[10]

The majority finally faults Styles for his failure to investigate a statement made by Acreman to Peace that Acreman, after he came from the school, stated that applicant was "having fun with a good looking girl." Notwithstanding that this statement *implicates* applicant, the majority suggests that it could possibly be a story created by Acreman to falsely implicate applicant and thus direct the investigation away from someone else. Thus the majority desires that Styles, who testified at the writ hearing that he did not believe the statement when told this by Peace, should have proven to himself that it was unworthy of belief. Again the majority ignores the record. At the writ hearing, Styles testified that he spent a great deal of time on the investigation of this case and that he attempted to eliminate other possibilities. Either the majority can believe or disbelieve this testimony, but *requiring Styles to disprove Acreman's statement was a deliberate falsehood created to cover up for someone else by actually finding that other person is an impossible requirement when there are no other possibilities.*

Finally, as a matter of reply to the concurring opinion filed herein, I agree that due deference must be paid to the findings of fact and conclusions of law made by the habeas court. But such has never been an absolute rule. See, e.g., *Ex parte Young*, 479 S.W.2d 451 (Tex.Cr.App.1972), and *Ex parte Guzman*, 589 S.W.2d 461 (Tex.Cr. App.1979). However, and as emphasized in Judge Campbell's dissent and reiterated herein, even if we take this habeas court's findings as true and accurate, no basis for relief is demonstrated. Furthermore, a reading of all the records including the first trial, second trial, first habeas hearing, and the present hearing leads me to no other conclusion than the findings are clearly erroneous. To tie this Court's hands and deny our Constitutional jurisdiction by requiring us to uphold erroneous findings of a habeas court is to return to the "good ole days" when trial courts could legitimately thwart the authority of this Court. See *State ex rel. Wilson v. Briggs*, 351 S.W.2d 892 (Tex.Cr.App.1961).

For all the reasons set forth above, I dissent.

CAMPBELL, J., joins this dissent.

CAMPBELL, Judge, dissenting.

This is a writ of habeas corpus filed pursuant to 11.07 V.A.C.C.P. Applicant was tried for and convicted of capital murder. He was sentenced to death. This writ application was filed and set to examine three of applicant's seven claims: (1) Whether "Petitioner was denied fundamental fairness and due process of law by the fact that critical evidence having the potential to prove that the applicant is innocent was lost and destroyed while in the exclusive possession of the State;" (2) Whether "The pretrial investigative procedures utilized by the State were so impermissibly suggestive of the applicant that it created false testimony calculated to manufacture circumstantial evidence against the applicant in violation of his constitutional rights to due process of law and a fundamentally fair trial;" and (3) Whether "Texas' death penalty system, as applied, discriminates against black defendants in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." The majority grants relief on the basis of the second claim, designated as number five in applicant's original petition,

---

10. The majority fails to relate that, upon defense counsel's request, the Attorney General's Office conducted an independent investigation of the Brandley trial. Robert Bodish, an investigator for the A.G.'s Office with fourteen years' experience, testified at the writ hearing that he investigated Bradford's statement. In so doing he concluded that where Bradford said that she had seen the men running through the gym, there is no access from the gym into the auditorium and that the two men would have been no where near where they would have had access to the auditorium. Thus the minute value that Bradford's statement may have in inculpating others is further diminished.

The Attorney General's complete report was excluded from evidence at the writ hearing upon applicant's objection.

without addressing the other two issues. I disagree with the majority's conclusion concerning the second claim and, therefore, must address the other two issues in order to determine whether I believe applicant is entitled to relief. Believing all of applicant's claims to be without merit, I would deny relief.

## I

In the first claim filed and set for consideration, applicant argues that the destruction or loss of several swabs taken from the vagina of Cheryl Ferguson and two Caucasian hairs taken from near the vagina of the deceased deprived him of a fair trial. In his application, he alleges the following:

1.) THE COTTON SWABS;

Cotton swabs were used to take samples from the victim's vagina shortly after the rape and murder occured [sic]. Semen and live spermatoza [sic] were present on the cotton swabs. Scientific analysis of the substances on the swabs could have proven the innocence of the Petitioner. The cotton swabs were either intentionally or negligently destroyed by the State while in the exclusive possession of the State. They were destroyed before the Petitioner's attorney had an opportunity to have them analyzed.

2.) THE PUBIC HAIRS

A reddish brown caucasian [sic] pubic hair and another brown body hair of probable caucasian [sic] origin were found near the victim's vagina. Scientific analysis performed by the Texas Department of Public Safety Crime Laboratory established that these two hairs were neither the Petitioner's nor the victim's. Sometime after the conclusion of

the Petitioner's second trial, these hairs were lost by the State while in the exclusive possession of the State.

Because the two caucasian [sic] hairs found near the victim's vagina were "lost" by the State, the Petitioner is now deprived of an opportunity to prove his innocence by scientifically comparing the two hairs with the pubic hairs of the caucasian [sic] murder suspects who have recently surfaced. The loss or destruction of this critical evidence while entrusted to the State of Texas denies the Petitioner his fundamental right to present evidence to prove his innocence.

In response to our order for an evidentiary hearing, the hearing judge entered several findings of fact relevant to applicant's allegations on this point. In regard to the cotton swabs, the hearing judge found that samples of fluids were taken from the vagina of Cheryl Ferguson with cotton swabs; these swabs tested positive for the presence of spermatozoa; no tests were conducted to determine the blood type of the donor of the spermatozoa; no record exist as to when or by whom the samples were destroyed; the swabs were not available shortly after the murder and before applicant's first trial; such swabs have critical evidentiary value; it is possible to determine blood type and other genetic characteristics of a donor from a sperm sample; such test can be used to exclude some rape suspects; it is, and was in 1980, standard procedure to preserve such samples; and there is no valid scientific justification for the destruction of such samples. In regard to the hair samples, the hearing judge found that four hairs were found near the victim's vagina, and one hair was a Caucasian pubic hair that did not belong to the victim or her boyfriend.[1]

In order for the destruction of evidence in the possession of the State to rise to the

---

1. The hearing judge also made findings concerning the State's failure to take blood and hair samples from other possible suspects and the presence of type A blood on the victim's clothing. These findings do not bear on applicant's allegation as plead in his application for writ of habeas corpus. Such allegations, if they had

been raised in this point, would not merit granting applicant relief.

> If the court meant by this statement that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here [sexual assault] is no different than a prosecution for drunk driving that rests on police observa-

level of a Due Process violation, a defendant must show that the destruction was the product of bad faith on the part of the State. *Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). The findings of fact entered by the hearing judge fail to establish that loss of either the swabs or the hair samples was due to bad faith on the part of the State. Within this context, bad faith would require that the State knew that the items destroyed would have been exculpatory.[2] *Youngblood,* —— U.S. at ——, 109 S.Ct. at 337 n. **; see also *California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Because applicant does not allege that the State knew the missing evidence was exculpatory and there is no evidentiary support for such an allegation, this claim for relief is without merit.

## II

In the second claim, applicant essentially argues that the prosecution and law enforcement officials instigated an investigation and prosecution founded upon racial bias and prejudice (the so-called "blind focus") that inexorably led to the wrongful conviction of an innocent applicant, violating his due process rights vouchsafed by the 14th Amendment to the U.S. Constitution. The foundation for this claim, however, the bedrock upon which it rests, is what may be loosely termed as newly discovered or available evidence. The "evidence" offered by applicant essentially consists of recantations and recantations of prior recantations of witnesses who testified at applicant's previous trials. Thus, a threshold question arises concerning the nature of applicant's claim and the fundamental issue of cognizability—i.e., whether applicant's "true" claim is cognizable in a post-conviction writ of habeas corpus. For the reasons about to be given, I submit that the claim is not cognizable and should not even be entertained by this Court.

The most succinct statement to be found concerning this area of the law was made by the Supreme Court in *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), viz:

"where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the State trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."

See also, *Anderson v. Maggio,* 555 F.2d 447 (5th Cir.1977); *Drake v. Wyrick,* 640 F.2d 912 (8th Cir.1981); *Burks v. Egeler,* 512 F.2d 221 (6th Cir.1975), cert. denied, 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975); *United States ex rel. Whitmore v. Malcolm,* 476 F.2d 363 (2nd Cir.1973).

The foregoing cases decided by the Supreme Court and the federal circuit courts

---

tion alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but *the police do not have a constitutional duty to perform any particular tests.*
*Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 338, 102 L.Ed.2d 281 (1988) (emphasis added); see also discussion of applicant's fifth allegation, *post.*

2. In his concurring opinion in *Arizona v. Youngblood,* Justice Stevens explains why limiting the Court's holding to "bad faith" cases is ample protection for future defendants.
   [A]t the time the police failed to refrigerate the victim's clothing, and thus negligently lost potentially valuable evidence, they had at least as great an interest in preserving the evidence as did the person later accused of the crime. Indeed, at that time it was more likely that the evidence would have been useful to the police—who were still conducting an investigation—and to the prosecutor—who would later bear the burden of establishing guilt beyond a reasonable doubt—than to the defendant. In cases such as this, even without a prophylactic sanction such as dismissal of the indictment, the State has a strong incentive to preserve the evidence.
   *Arizona v. Youngblood,* —— U.S. at ——, 109 S.Ct. at 338 (Stevens, J. concurring).

reflect only federal habeas practice. However, this Court, in a unanimous opinion decided just six years ago, elected to follow the federal courts in this area. See *Ex parte Binder*, 660 S.W.2d 103 (Tex.Cr.App. 1983). In *Ex parte Binder*, supra, this Court held:

> "The basic principle of the state and federal cases heretofore examined, would appear to be that the mere raising of a claim of newly discovered evidence is, standing alone, not a fit subject for the exercise of state or federal habeas corpus powers.
>
> * * * *
>
> Applicant is obviously free to pursue any remedies the state *executive* branch has to offer." [my emphasis] 660 S.W.2d at 106.

Further, this Court, in *Ex parte Banspach*, 130 Tex.Crim. 3, 91 S.W.2d 365 (1936), over fifty years ago stated:

> "It is well settled by the decisions of the Court of Criminal Appeals that the merits of a case involving the guilt or innocence of an accused are not a proper subject of inquiry in a habeas corpus proceeding ... This Court has consistently declined to permit the writ of habeas corpus to usurp the function of an appeal."

Even assuming, arguendo, that applicant can establish a cognizable "blind focus" claim under Art. 11.07, supra, he must do so by showing that these recantations and recantations of prior recantations of trial witnesses produce a violation of applicant's rights that rises to a level of deprivation of due process of law. As I will show, the majority opinion attempts to take these recantations and recantations of prior recantations and wrap them in the more attractive cloak of due process of law and thereby grant applicant relief.

The majority opinion relies heavily on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny and a series of Supreme Court cases concerning improperly suggestive lineup procedures. I will begin by discussing these two doctrines and what must be proven in order to obtain relief under them; then, I will discuss the facts of this case, both as stated in the majority opinion and as appearing in the record, and show why relief is not proper.

In order to sustain a *Brady* claim, a defendant must not only show that the suppressed evidence was exculpatory, but that it was material in a constitutional sense. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. The Supreme Court has examined the materiality requirement of *Brady* on several occasions. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court discussed this materiality requirement.

> The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the "sporting theory of justice" which the Court expressly rejected in *Brady*. For a jury's appraisal of a case "might" be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.
>
> Whether or not procedural rules authorizing such broad discovery might be desirable, the constitution surely does not demand that much.

*Agurs*, 427 U.S. at 108–09, 96 S.Ct. at 2400 (footnote omitted). See also *Moore v. Illinois*, 408 U.S. 786, 795–96, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The Court further clarified this standard in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

> [Undisclosed] evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

\* \* \* \* \* \*

The reviewing court [3] should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Bagley,* 473 U.S. at 682–83, 105 S.Ct. at 3384 (emphasis added). See also *Ex parte Adams,* 768 S.W.2d 281, 289–90 (Tex.Cr. App.1989).[4]

The majority has limited its inquiry into the record to a determination of whether there was some testimony on which the hearing judge could have based his individual findings of fact. While such an approach may be proper in determining whether the findings are "supported by the record," it wholly fails to make the determination of materiality required of us by the United States Supreme Court.

The Supreme Court has adopted a similar standard of materiality for cases in which improper police procedure has produced an unreliable identification. In *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the defendant was taken to the hospital room of one of his alleged victims. The victim was asked whether the defendant was the man who had killed her husband and attacked her.

She positively identified the defendant, and before the Supreme Court, he challenged the identification as being the product of an unconstitutionally suggestive procedure. The Court stated:

> We turn now to the question whether petitioner ... is entitled to relief on his claim that ... the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.... The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the *totality of the circumstances surrounding it....*

*Stovall,* 388 U.S. at 301–02, 87 S.Ct. at 1972 (emphasis added); cf. *Foster v. California,* 394 U.S. 440, 442–43, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969) (repeated lineups in which defendant was the only common suspect held to violate standard set out in *Stovall* ). Thus, the question relevant to suggestive investigative procedures is virtually identical to that of "materiality" in a *Brady* setting—was the procedure so unfair that it calls into question our confidence in the verdict. Again, because the majority fails to examine the effect of the suggestive procedures, it overlooks a threshold question necessary to grant applicant relief.

In its opinion, the majority focuses on three factual occurrences in granting relief.[5] First, they discuss the "walk-through" and the possibility that this pro-

---

3. The majority argues that we should defer to the hearing judge's findings if they are supported by the record. However, the majority's authority for this proposition is limited to *factual* findings. I am aware of no authority that would require us to defer to legal conclusions made by a lower court, and the Supreme Court seems to regard the question of materiality as either a legal issue or one of mixed law and fact. Because they have set out this duty for the *reviewing* court, materiality is an issue for us to decide de novo.

4. In *Adams,* this Court noted that the Supreme Court has applied a different standard to the

State's "knowing" use of perjured testimony— whether the testimony might have affected the verdict. 768 S.W.2d at 290. Applicant does not argue that he is entitled to relief based on the State's knowing use of perjured testimony. To this extent, this less-restrictive standard for constitutional error is inapplicable to this case.

5. The majority also expends a significant amount of effort discussing various investigative leads not pursued during the investigation of this crime. The majority characterizes its use of these factors to bolster its position that the

cedure was unnecessarily suggestive and caused several witnesses to improperly alter their testimony. Second, they discuss Ranger Style's intimidation of Henry Peace. And third, they discuss Cheryl Bradford's statement to the police that she had seen two white men walking through the gym at the approximate time of the killing. I do not believe that any of these three occurrences rise to the level of constitutional infirmity necessary to warrant relief.

Assuming, arguendo, that the hearing judge's findings of fact are correct[6] and that the majority is correct that the walk-through was conducted in an improperly suggestive manner, the record does not support a conclusion that the effect of the walk-through was constitutionally material. Three of the five janitors on duty the day of the murder went through a joint walk-through of the school with Ranger Styles on August 30, 1980: Gary Acreman, Sam Martinez, and John Sessum.[7] Each of these three men gave written statements before and after the walk-through. Comparison of the pre-walk-through statements with the statements given after the walk-through reveals that the changes in the witnesses' accounts are very minor.

The first thing that one notices when comparing any of the pre and post walk-through statements is that the statements taken after the walk-through are, without exception, longer and more detailed than those taken before the walk-through. This fact does not establish that the walk-through somehow tainted the witnesses'

statements. The first set of statements were written by each witness himself. The second set of statements were the product of an interview with the witness by Ranger Styles. It is reasonable to believe that the prodding of Ranger Styles would increase the detail of each statement without compromising the integrity of any witness's account of what he observed. In addition, the mere act of tracing one's steps throughout the day would likely produce greater detail even without pressure to conform one's account with those of the other witnesses. The additional length of the statements does not establish that the walk-through altered any testimony in an improper manner.

Before the walk-through, John Sessum gave the following written statement:

> I come to the school about 8:00 A.M., I rode to work with Gary in his Datsun Pickup, orange and white color. We park in front of the vocational building. We walked over to the main building, the doors were all locked and we waited for Clarence. We waited about 10 or 15 minutes. Sammie [Martinez] came up after we got there and was also waiting. Clarence came down the sidewalk and opened the door. There was another subject Eckie [Henry Peace] a short stocky guy, he also came up about the same time as we did. All five (5) of us then went to the cafeteria and Clarence showed us where to set up the tables and chairs. It took about a hour and a half to set up the chairs. When we finished we walked out in the hall to the front of the building. We waited 10 or 15 min-

investigation was conducted with a blind focus. I disagree with this position.

Clearly, there is no constitutional necessity to exhaust possible leads or to conduct specific scientific tests. *Youngblood*, —— U.S. at ——, 109 S.Ct. at 338.

By discussing these points the majority does not clarify this case by providing circumstantial evidence of a generally slipshod investigation. Instead, it changes the opinion's focus from whether the pretrial investigative procedures were constitutional, to whether they were, in some subjective sense, "good." Our duty is neither to castigate nor praise the State's investigation in this case. Our job is limited to looking

for constitutional error. This discussion of "lost leads" is simply a red herring.

6. The hearing judge did not make a specific finding concerning the materiality of *any* alleged constitutional errors.

7. The other two janitors were Henry Peace and applicant. Peace did not participate in the walk-through because of the distance that he lived from the school and because all written statements placed him apart from Acreman, Martinez, and Sessum at the relevant times.

utes. There were a couple of people standing in the hall around the end where the gym is. When Clarence came up a girl was coming up behind him. We kidded him about watching out, there is a pretty girl coming up behind him. She had blond shoulder length hair, about 5' tall, she had blue jeans and a pullover sweater on. Clarence told us what we had to do and where to go. The four (4) of us then went to the annex to set up the chairs. Clarence said he had something else to do and stayed behind. We sat at the annex about five (5) minutes, then Eckie went back and got the keys from Clarence. When he got back we set up the tables and chairs. We finished it and it was around 10:30 or 11:00 A.M. Clarence came over and told us it looked good and we could go home. That is when Gary [Acreman] and I left, I do not know when Clarence and the other two left [sic in passim].

Sessum's statement given after the walk-through stated:

On Saturday, August 23, 1980 I arrived at my job at the Conroe High School somewhere between 7:00–7:30 A.M. I rode in with Gary Acreman. We went to the north side of the building to wait for Clarence Brandley to come unlock the door, because he is the supervisor and is the only one who had a key to the doors. Henry Peace was also there when Gary and I arrived and a few minutes later, Sammy Martinez got there. We waited approximately fifteen (15) minutes for Clarence. When he got there, he unlocked the door on the north side of Conroe High School and we all went in. Clarence took us (me, Gary, and Sammy) to the Cafeteria and told Henry Peace to buff the floor in the Teachers' Lounge. Clarence then unlocked the door to the lunchroom and told us to put the tables and chairs back in it. Clarence then unlocked the side door of the lunch room that leads into the hallway of the Auditorium area. We finished setting up the tables and chairs around 9:30 A.M., and then came back out through the same door we entered from, and walked down the hallway of the Auditorium area to wait for Clarence to come tell us what to do next. We were waiting just a few feet away from the stairs that lead up to the Choir Room area. There are two restrooms at the top of the stairs—one for ladies and one for men. We stood there for approximately fifteen (15) minutes and saw a white female student with shoulder length blonde hair, wearing blue jeans and a slip-over type shirt, (color unknown) come up the stairs from the gym area. She went on up the other flight of stairs and went into the ladies' restroom. Just as she went into the restroom, Clarence came up the stairs from the gym area. He was carrying several rools of toilet tissue and he started up the other flight of stairs toward the restrooms and Gary hollered at him and told him there was a girl in the restroom He said, "I'm not going in the restroom, you all go on over to the Vocational Building and start setting it up for a meeting, and I'll be on over." Clarence went on up the stairs and turned right into the direction of the stage of the Auditorium. Gary, Sam, and I started walking on toward the Vocational Building and Henry Peace came out of the Teachers' Lounge with the buffer. He left the buffer there and joined us and we all went to the Vocational Building. We waited in front of the building for approximately forty-five (45) minutes before Clarence came out of the other building. He came out the same door on the north side and walked toward us for a way, then called Henry to come get the key and unlock the door. Henry unlocked the door and we went in. We finished around 11:45 A.M. and Clarence came back over to the Vocational Building and told us that we could go home. Clarence had a white towel around his neck, and I said, "What's the matter? You're sweating too much." Clarence just said, "Ive been working hard. He was acting nervous and trying to hurry us out. Then he asked me for the gray

canvas work gloves that I had found in the lunch room when we were working down there, and said they were his, so I gave them to him. He asked me if we were through with the dolly, and I told him "yes", and I went and got it for him. Clarence and Henry then left the Vocational Building and went back toward the other building across the street. On Tuesday, August 26, 1980, Clarence was talking to Gary and me. Gary asked him about the little girl who was killed at Conroe High School on Saturday, and Clarence said, "If they start asking me any questions, I'm gonna get me a lawyer" [sic in passim].

The vast majority of differences between Sessum's statement given before the walk-through and the one given soon after can be characterized as being the addition of facts neither present in the first statement nor *inconsistent* with that statement. As discussed above, such changes are not indicative of improper influence. The only differences between the statements which cannot be explained in this manner is the assertion in the second statement that Cheryl Ferguson arrived on the scene before applicant and the placing of him there before her and the amount of time between going to the vocational building and Henry Peace getting the keys from applicant.[8] These differences are of minor importance. The walk-through failed to shake Sessum's testimony that applicant was at the scene of the murder at approximately the time that Ferguson was killed and that applicant was out of the presence of the other janitors for a time sufficient to kill Ferguson and to move her body to where it was found in the auditorium. Thus, the facts essential to the State's case remained the same. Finally, because Sessum did not testify at applicant's second trial, the one in which he was convicted and that now serves as the basis for this writ, the walk-through could not have produced false testimony by this witness.[9]

Gary Acreman's first statement, taken before the walk-through, states:

We were asked to work Saturday. We showed up at 7:30 AM. We started setting up the cafeteria for Monday morning then went looking for Clarence to see what else he wanted us (John, Sam, Icke, and I) to do. As we were coming back from the gym we turned to look behind us and saw a girl, Blonde girl going into the restroom. Clarence showed up with several rolls of toilet tissue we told him that someone was in the girls restroom. He told us to go over to the vocational bld. so we could set up for a meeting for Monday. All four of us went over to the vocational bld. and didn't see Clarence for 45 minutes. We had to wait on him for the key to get in. He called Icke back over across the street and gave him the key and I didn't see Clarence anymore until 11:45 and he told us to go home [sic in passim].

The statement taken after the walk-through states:

On Saturday morning, August 23, 1980, we got to our jobs at the Conroe High School. Clarence Brandley, Samuel Martinez, John Sessum, Henry Peace, and I were working that day. Peace, Martinez, Sessum, and I waited on the bench

---

8. One possible explanation for Sessum's account changing the amount of time that they waited at the vocational building for the keys from five to forty-five minutes is testimony that Sessum was napping during this period.

9. Sessum is not without credibility problems. Since testifying in the first trial, he has recanted his previous version of the facts. He now maintains that Acreman and another man, presumably Robinson, abducted the girl and forced her into the bathroom. He attributes his change in testimony to an attack of conscience, and the threats that caused him to testify in this previous manner are no longer as important as being at peace with himself. Regardless of what the truth is, nothing suggests that the walk-through produced these conflicting versions.

Sessum also testified at the writ hearing that he felt intimidated by Ranger Styles to conform his statement to those of the other janitors. Even if this is true, Sessum's failure to testify at the trial underlying this writ precludes applicant from obtaining relief based on Sessum's participation in the walk-through.

on the north side of the high school for Clarence. Clarence is the supervisor, and is the only one of the crew who has keys to the doors. Clarence got there around 7:40 A.M. and unlocked the door on the north side of the building and took us to the cafeteria. He told Henry Peace to go buff the floor in the Teachers' Lounge, and told Sammy, John, and I to put all the tables and chairs back in the cafeteria. Then Clarence unlocked the door to the cafeteria from a hallway. Then he went on into the cafeteria and unlocked a side door of the cafeteria that opens into a hallway of the Auditorium area. We finished around 9:30 A.M. or a little later, and John, Sammy, and I left the cafeteria through the same door as we had entered and walked into the hallway area of the Auditorium to wait for Clarence to give us our next assignment. We stood in the hallway just a short distance from the stairs that go into the Choir Room area. We had been there only two to three minutes when a young white female with medium length blonde hair came up the stairs from the gym area and went on up the stairs to the direction of the restrooms at the top of the stairs. She went into the ladies' room. We saw Clarence coming up the stairs from the gym and he had several rolls of toilet tissue in his hands. He started on up the stairs to the area of the restrooms, and I told him there was a girl in the ladies' restroom. He said he wasn't going in there and he then told the rest of us to go on over to the Vocational Building and that he would be over in a little while. Clarence walked on upstairs and turned right and walked toward the door that leads to the stage area of the Auditorium. This was approximately 9:40 A.M. We left and were walking down the hallway and we saw Henry coming out of the Teachers' Lounge with the buffer. He left the buffer there and went with us. The four of us left the building through the same door on the north side as we had entered earlier. We went to the Vocational

Building and waited there in front of the building for Clarence to come unlock the door. Between 10:15–10:20, I went back over to the Teachers' Lounge and got a coke. I got the coke and went right back out through the same door on the north side of the building and I didn't see Clarence anywhere in the area around the Teachers' Lounge. When I got back to the Vocational Building, I saw Clarence coming out of the same door on the north side of the building. He walked toward the Vocational Building for a way, and stopped and called Henry to come get the key. Clarence had a white towel around his neck. I had never noticed a towel around his neck before. After he gave Henry the key, Clarence turned and went back into the building through the north side door. Henry unlocked the door and we went on and finished setting up the chairs for the custodial meeting scheduled for Monday. At about 11:45, Clarence returned to the Vocational Building and told us we could go home. Clarence seemed to be acting different than the last time I had seen him over in the other building. He seemed very nervous and seemed to want us to hurry and go. I did not know what had happened at Conroe High School until Sunday morning when I read it in the Conroe Courier. On Monday, August 25, 1980, the custodial meeting was set for 8:00 A.M. I arrived a little early, and I saw Clarence and Henry there for the meeting. I asked Clarence if he knew what the girl looked like that was found deat at Conroe High School and he said, "All I know is that she had blonde hair." He never said anything else about her. I also talked with Henry before the meeting and was telling him what I had read in the newspaper, and Henry said, "I was the one who found her." He said he found her in the Auditorium, lying behind some plywood. Clarence was standing about five (5') feet from me when I found her. The next time I saw Clarence was Tuesday, August 26, 1980. He told me that he went down to Houston to take a poly-

graph test. He also said that as far as he knew, he passed it. Clarence also said "If the officers question me anymore about it, I'm going to get me a lawyer." I have noticed that since Saturday, August 23, 1980, Clarence has been acting nervous. I have not worked under him since that day, but I have seen him. Clarence is the night shift supervisor, and is the only one of the crew who has a key to the doors. R.L. Phillips is the day shift supervisor, and is the only one of that crew who has a key to the doors [sic in passim].

Each difference between Acreman's first and second statements is merely the inclusion of an additional fact not present in the first statement. As explained above, such additions are not indicative of improper influence and do not call the accuracy of Acreman's testimony into question.[10] The record simply does not support an inference that Acreman's testimony or statements were changed in any way as a result of the walk-through. And, even if one does believe that the walk-through tainted Acreman's testimony to *some* extent, it is absolutely unreasonable to believe that the walk-through "conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification" or testimony. Stovall, 388 U.S. at 301. Such is the high burden set out by the Supreme Court, and applicant does not meet it.

Sam Martinez's first statement, given before the walk-through, states:

Went to work around 7:35 A.M. in cafeteria to put table and chairs in cafeteria. Finished in cafeteria sometime between hour of 9:00 A.M. and 9:30 A.M., not sure when. Next went to look for Clarence, found him coming up stairs with two rolls of toilet paper or towel paper. Then saw blonde-headed girl go to the girl's restroom. She had on blue jeans, medium hair. Next we asked Clarence what to do, he told us to go across the street to the Vocational Building. We did, and then we waited about 30 minutes before he came out the mail building and called to the short man to come to get key to the building. Then we set the chairs up there, we finished this, then he came and told us that we were finished, which was about 11:00 A.M. or little after [sic in passim].

In his second statement, Martinez said:

On Saturday, August 23, 1980, I arrived at by job at the Conroe High School around 7:30 A.M. When I got there, Gary, John and Henry were already waiting. We waited for Clarence Brandley because he is the supervisor and is the only one of us who has a key to the door. Clarence got there around 7:30 A.M. He unlocked the door on the north side of Conroe High School and we all went in. Clarence took me, John, and Gary to the cafeteria, and told Henry to go buff the floor in the Teachers' Lounge. Clarence unlocked the door to the cafeteria and told us to put the tables and chairs back in there. Then he unlocked the side door of the cafeteria that opens into the hallway area of the gym. We set up all the tables and chairs and finished at approximately 9:30 A.M. Then Gary, John, and I came out of the cafeteria through the same door as we had entered, and walked on down the hallway of the Auditorium area to wait for Clarence to give us our next assignment. We waited in the hall just a short way from the stairs that lead up to the choir room. There

---

**10.** Like Sessum, Acreman has subsequently changed his story about what occurred on the day of the murder. On March 17 and 20, 1987, Acreman said that he saw Dexter Robinson at the school that day and that Robinson grabbed Ferguson and took her into the bathroom. Since that time, Acreman has again changed his version of events and claims that things happened in the manner that he had previously testified. Nothing in the record suggests that the walk-through is the source of these conflicting statements. When Acreman first recanted, he attributed the difference to a change of heart brought about by his conscience. When he recanted this recantation, he attributed the different story to intimidation on the part of applicant's investigators. While the accuracy of Acreman's testimony is in serious doubt, the doubts do not arise as a result of the walk-through.

are also two restrooms at the top of the stairs. The ladies' restroom is the one nearest the stairs, and the other one is for men. We had only been standing there for a few minutes when I saw a girl going up the stairs toward the restrooms. She was a young white female, with shoulder length blonde hair. She was wearing blue jeans and a wide leather belt that looked like a cowboy belt with some type carving, maybe a name on the back. She went on up the stairs and went into the ladies' restroom. Clarence came up the stairs from the gym and was carrying some toilet tissue. He started on up the stairs toward the restroom and Gary hollered out to him that there was a girl in the restroom. Clarence said he wasn't going in the restroom and for us to go on over to the Vocational Building and he would be over in a little while. We started walking on over to the Vocational Building and Henry had finished in the Teachers' Lounge, and he joined up with us. We left the building through the same door on the north side and went across the street to the Vocational Building and waited for Clarence to come unlock the door. We waited for approximately forty to forty-five (40–45) minutes for Clarence to come unlock the door. Sometime after 10:30 A.M., Clarence came out of the building on the north side and walked toward the Vocational Building for a short way, and then called Henry to come get the key. Clarence turned around and went back into the building through the north side. Henry unlocked the door and we set up the vocational building for a custodial meeting on Monday, August 25, 1980. We finished the building around 11:30 A.M. and Clarence came in and checked the building and told us we could to home. We started to leave and Clarence told John that the gloves he had found early that morning were his, and that he wanted them.

John gave the gloves to him. They were gray canvas type work gloves. Then Clarence got a dolly from the Vocational Building and he and Henry went back over to the other building across the street and went back inside through the north door and I went home [sic in passim].

The two statements of Sam Martinez are essentially identical to those of Sessum, with the exception that Martinez did not change his estimate of the time they waited at the vocational building for keys. The only difference between the two statements, other than inclusion of additional details, is the order in which applicant and Ferguson arrived at the bathroom. Again, this is a minor difference and does no damage to the essential evidence relied upon by the State. Nothing suggests that the walk-through lead to an "irreparable" influence on Martinez's testimony, as required by *Stovall*, 388 U.S. at 301–02, 87 S.Ct. at 1972–73.[11]

While there are almost insurmountable credibility problems with the testimony of Acreman and Sessum, which in turn might implicate Martinez's testimony, these credibility problems do not stem from the walk-through. Because of this, applicant should not be granted relief based on the walk-through.

The second factual occurrence that the majority uses to grant relief is Henry Peace's testimony at the hearing that he was intimidated and physically abused by Ranger Styles. Peace's first statement to the police, taken before Ranger Styles arrived in Conroe and the walk-through was conducted, is consistent with a statement later given to Ranger Styles and his testimony at both trials and the writ hearing. In fact, Peace testified at the hearing that he is now telling the truth about what he saw at the school on the day of the murder and that he has told that same story in every statement he has given and on every

**11.** As noted by the majority, Martinez has since changed certain details in his testimony. Nothing in the record suggests that these changes were related to any corrupting influence of the walk-through.

occasion he has testified. Thus, if Peace is to be believed, as the hearing judge has decided to do, then Style's intimidating tactics did not produce any unreliable testimony. Because of Peace's testimony, this alleged constitutional defect in the investigation is not constitutionally material and entitles applicant to no relief.[12]

The final incident relied upon by the majority concerns a statement given by Cheryl Bradford that she observed two men in the gym near the time of the murder. As stated above, to grant applicant relief based on this allegation[13] would require us to find that Bradford's statement is exculpatory, to applicant, and is material. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

First, I begin by noting that Bradford's statement is not exculpatory. Proof that one or more individuals other than applicant participated in the commission of this offense would not exclude the possibility of applicant's guilt. *Black's Law Dictionary* provides the following definitions:

> **Exculpatory.** Clearing or tending to clear from alleged fault or guilt; excusing.
>
> \*    \*    \*    \*    \*    \*
>
> **Exculpatory statement.** A statement which tends to justify, excuse or clear the defendant from alleged fault or guilt.

Testimony of the presence of these two men at the gym neither tends to justify applicant's actions nor is it inconsistent with his guilt. Even if the two men participated in the crime, something to which Bradford does not and cannot testify, all evidence still placed applicant at the scene of the crime; applicant was still the only black male at the school who might have been the donor of the hairs on Cheryl Ferguson's body; applicant was still separated from the other janitors at the time the

---

**12.** As a collateral matter, not raised in applicant's writ, the majority suggests that the State knowingly used perjured testimony when Peace testified at trial, and they note that the hearing judge found that Peace perjured himself at trial. In order to reverse a conviction because of the use of perjured testimony, the defendant must establish that the perjured testimony was "known to be such by representatives of the State." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397. Assuming, arguendo, that this issue is properly before this Court, applicant fails to prove a *knowing* use of perjured testimony.

At the hearing, Peace admitted to having lied twice under oath. At the first trial, he lied about an incident, not connected with the murder, in which he showed a fellow janitor a handgun while at school. He said that he had displayed a picture of a gun rather than an actual gun. At the second trial, the State made it known to the jury that Peace had shown a real gun, and the jury heard such testimony directly from Peace. There is nothing to suggest that the State knowingly used this perjured testimony. To the contrary, when the State learned of the inaccuracy they corrected the erroneous testimony in a forthright and candid manner. The Supreme Court has implicitly stated that such a procedure would not violate the constitution. See *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177.

The second incident of perjury has much more serious implications. At trial, Peace was asked standard questions about the voluntariness of his testimony and the absence of any coercion. Peace said he had not been threatened in any way. Prior to trial, however, Peace had complained to the District Attorney's office about Styles physically abusing and threatening him. Thus, when Peace answered these questions, he lied. I do not feel that this incident constitutes the knowing used of perjured testimony. The District Attorney's position has consistently been that Peace's accusations are false. Ranger Styles denies that he threatened Peace, and there is simply no other evidence pointing in either direction. While the record supports the hearing judge's finding that Styles assaulted Peace, it also supports the opposite finding. To this extent, the State has a legitimate argument that they did not knowingly use perjured testimony. Our acceptance of the hearing judge's factual findings does not make those findings true in some objective sense, nor does it mean that all parties, at all times, believed or had knowledge of the facts as determined in Judge Pickett's order. There is no factual basis for the majority's assertion that the State knew this testimony to be false, and the trial judge made no such finding.

**13.** Applicant does not allege in his writ that failure to disclose Bradford's statement constituted a *Brady* violation. Instead, he argues that the failure to investigate the statement is evidence of the blind focus of the State's investigation. As discussed above, failure to explore possible leads is not a constitutional violation. *Youngblood*, ——— U.S. at ———, 109 S.Ct. at 338; see also note 3, *ante*.

victim's body was placed in the auditorium; and, there would still be evidence that applicant knew the location of the victim's body before it was found by Peace. Bradford's ominous testimony that the man she saw in the gym might have been Dexter Robinson does not help applicant because the State did not learn of Robinson's possible involvement until years after applicant was convicted. For these reasons, I do not believe that Bradford's statement was exculpatory.

In addition, even if exculpatory, Bradford's testimony was not material. In order to be material, the majority would have to find that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. Instead of undertaking this required analytical step, the majority leaps from a finding that the statement was exculpatory to the conclusion that applicant is entitled to relief. I cannot imagine that the revelation of this minor piece of evidence would have swung this entire prosecution around to an acquittal. I challenge the majority to set out a reasonable scenario in which such a change in result would be more likely than not. Short of such a scenario, the majority should not have granted relief based on this issue.

### III

In the third claim filed and set, applicant alleges facts to support a claim that "Texas' death penalty system, as applied, discriminates against black defendants in violation of the Fifth Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." Although this claim is based on *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), applicant alleges facts in addition to statistical evidence that black defendants are more likely to receive the death penalty. The hearing judge entered the following findings of fact in regard to this claim:

1. The Petitioner, Clarence Brandley, is a black man.

2. The victim, Cheryl Fergeson, was a 16 year old white girl.

3. Dr. Sheldon Ekland–Olson, testified at the evidentiary hearing as an expert witness. Dr. Ekland–Olson is a faculty member at the University of Texas at Austin. He holds a doctorate degree in Sociology and also attended Yale Law School.

Dr. Ekland–Olson conducted a research project which analyzed the application of the death penalty in Texas during the years 1974–83, the first decade of the "new" Texas death penalty statute. Unlike the death penalty statutes in other states such as Florida and Georgia, the Texas statute is a "structured" or "guided discretion" statute, designed to eliminate the racial disparity in the application of the death penalty which the Supreme Court found offensive and unconstitutional in *Furman v. Georgia* [408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)].

Using data collected from the several hundred Texas capital convictions which occurred during the first decade of the post-*Furman* statute, Dr. Ekland–Olson sought to determine whether Texas' new guided discretion statute was in fact being applied in a non-discriminatory manner.

After accounting for the significant variables, Dr. Ekland–Olson's analysis of the data revealed the Texas death penalty statute, as applied, has not produced non-discriminatory results. Significant race-linked discrimination exists[,] in that capital cases involving white victims are more likely to precipitate the death penalty than cases involving black victims.

The research regarding rape homicides in Texas, the offense for which Petitioner was convicted, reveals that the most likely person to receive the death penalty in Texas is a black man convicted of the rape homicide of a white woman. Taking into account all of the various offenses eligible for the death penalty in Texas, and all of the many possible of-

fender/victim racial combinations, the probability of being executed in Texas is increased five fold for a black man convicted of the rape homicide of a white woman.

The research of Dr. Ekland–Olson, establishing that the Texas death penalty statute has produced victim-based racial discrimination, is consistent with the other research done in Texas and throughout the country, particularly the sophisticated Baldus study which the Supreme Court accepted as statistically valid in the *McCleskey* case. [481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)]

4. The jury in Petitioner's first trial was all white. The State had used peremptory challenges to strike all qualified blacks.

5. The jury in Petitioner's second trial was all white. The State had used peremptory challenges to strike all qualified blacks.

6. At the time of Petitioner's first and second trials, the District Attorneys [sic] Office in Montgomery county utilized several prosecution manuals. The manuals were resource or reference books which instructed the prosecutors on all aspects of how to try a criminal case. The manual recommended that black persons not be allowed to serve on any criminal jury.

7. At the time of Petitioner's first and second trials, a routine or practice existed in the Montgomery County District Attorney's office that all black persons were to be stricken from the jury panel when there was a black defendant. Had any Assistant District Attorney allowed a black person to serve as a juror, the District Attorney, James Keeshan, would have required that assistant to explain why he departed form standard practice by allowing a black person to serve on a criminal jury.

8. No lawyer having practiced in Montgomery County can recall a black person ever being permitted to serve on a jury when there was a black defendant, except one instance in 1978 when a black Conroe police officer was allowed to serve on a jury.

9. The jury at Petitioner's first trial ultimately became deadlocked 11 to 1 for conviction. The lone holdout, William Shreck, failed to vote for conviction because he felt that the State had not proven Petitioner's guilt beyond a reasonable doubt. During the deliberations, the other jurors repeatedly called William Shreck a "Nigger [sic] lover." After a mistrial was declared, William Shreck received thousands and thousands of harassing phone calls. During the first month, the harassing calls would arrive every five seconds when the phone was left on the hook. On those occasions when the phone was answered, the caller would exclaim "nigger lover" and then hang up.

In April of 1987, six years after the mistrial was declared, William Shreck applied for the position of purchasing agent for Montgomery County. Of the seventy-odd applicants for the job, William Shreck was selected as one of the several finalists. Mr. Shreck had considerable experience based on the thirty-odd years he was employed as a purchasing agent for an oil company in Houston. As a finalist, the five district judges and the county commissioner of Montgomery County interviewed William Shreck. During the 45 minute interview, approximately 45 minutes was consumed by the judge's questions regarding why Shreck did not vote for conviction at the first Brandley trial in 1980. Judge Keeshan asked many of the questions. The district judges then told William Shreck that his "not guilty" vote at the first trial demonstrated that he could not get along with people. The judges denied Mr. Shreck the job.

10. Shortly after the victim's body was found on August 23, 1980, a white Conroe police officer had a conversation with Henry Peace regarding who perpetrated the murder. The officer then turned towards Clarence Brandley and

announced to Peace that "The nigger was elected."

11. Prior to Petitioner's first trial, Petitioner's attorneys approached the Sheriff of Montgomery County, Gene Reaves, to post Petitioner's bond. Bond had been set at Thirty Thousand ($30,000.00) Dollars and Petitioner's attorneys had good and sufficient surety to make the bond. The Sheriff refused to accept the bond, however, stating that "The little Nigger [sic] doesn't belong on the ground." District Attorney James Keeshan was present and agreed, echoing the Sheriff's phrase that the "little Nigger [sic] doesn't belong on the ground."

After both Sheriff Reaves and District Attorney Keeshan made their intentions clear that they didn't want the "little Nigger [sic]" to make bond, Keeshan met with Judge Lee Alworth without any notice to defense counsel. Judge Alworth thereafter signed an ex parte order prepared by Keeshan which raised Petitioner's bond to Seventy Thousand ($70,000.00) Dollars.

12. Racial considerations infected the atmosphere within the courtroom during Petitioner's trial. Many members of the public, both black and white, attended Petitioner's trial. The Montgomery County Sheriff's Department treated the black spectators differently, however. When a black person exited the courtroom during trial, one of the numerous sheriff's deputies on hand would follow the black person from the courtroom and keep the person under observation. An elderly black gentleman, Reverend J.J. Robinson, pastor of the Mt. Hebron Baptist Church in Houston, was even followed by a deputy when he went to the restroom.

Several witnesses testified at the evidentiary hearing that a powerful feeling of prejudice and racial tension pervaded the courtroom. Judge Martin's secretary, Janet Dial, heard an elderly white woman openly repeat to herself in the courtroom, but plainly audible to others, "Kill the nigger, kill the nigger ..." The sheriff's deputies allowed the woman to remain in the courtroom.

The Reverend Anderson Davis, a highly educated person in his middle 60's, testified that of the many trials that he has personally witnessed over the years in the State of Texas, Georgia, Virginia and Tennessee, on only one other occasion did he experience a trial where the racial tension in the courtroom compared to that of the Brandley Trial. That trial was in Chattanooga, Tennessee in 1946 when a prosecution witness stated, without reproach from the court, that he knew three things about "niggers": They all lie, steal and smell.

The tone of the courtroom, as fostered by the District Attorney's Office, the Judge and the District Clerk's office, was white against black. One example of this white against black atmosphere is evident in the in-chambers discussion during the penalty phase, where the district attorney complains to the trial judge that a black woman had sat on a white woman's hand. District Attorney Keeshan further reveals his personal white versus black posture when he suggests that if any announcements to the audience are necessary, he will make an announcement to the white people and Petitioner's attorney could make an announcement to the black people. Wholly apart from the judge's legal rulings, the demeanor and attitude of the judge was hostile to the Petitioner and the black members of the audience. The Reverend J.J. Robinson testified that the judge's attitude towards Petitioner and the black people in the audience clearly revealed the judge's partiality in the case. The Reverend did not feel comfortable even being in the courtroom.

13. During petitioner's second trial, a "team-like" or "company" atmosphere existed at the courthouse between Judge Martin's staff, the District Attorney's Office and the District Clerk's office. The "project" or "goal" of the team was to convict the Petitioner. Employees of

Judge Martin's staff and the District Clerk's Office felt pressure to be team players and were too intimidated to act impartially towards Petitioner or to even voice any suggestion regarding Petitioner's possible innocence.

The "project-like" atmosphere pervaded the courthouse during Petitioner's second trial. The atmosphere existed even after the conviction, as evidenced by the agreement, between Judge Martin, the District Attorney and the District Clerk, to keep secret the fact that critical exhibits had become missing. A sordid instance where the "project like" mentality overbore any sense of justice and decency at the courthouse can be seen in the conduct of the District Clerk and the District Attorney when Attorney Don Brown began inquiring about the missing trial exhibits. When Don Brown informed District Clerk Peggy Stevens that he was going to ask District Attorney Keeshan about the missing exhibits, Peggy Stevens rushed to warn Keeshan at his office. Keeshan and Peggy Stevens then hid in the district attorney's office and laughed when Don Brown arrived and the District Attorney's secretary got rid of him. The "project-like" atmosphere culminated on November 22, 1985, when Judge John Martin, at the special request of District Clerk Peggy Stevens, set Petitioner's execution date for January 16, 1986—the District Clerk's birthday. (It should be noted that Judge Martin had no authority to even set Petitioner's execution date, let alone set the execution to coincide with the District Clerk's birthday celebration. Judge Martin had no authority because he had voluntarily recused himself from further handling of petitioner's case in March, 1982, after defense counsel had confronted the Judge, on March 5, 1982, with the knowledge that the Judge had

conducted ex parte meetings with the District Attorney regarding Petitioner's case.)

Based on the demeanor of Judge John Martin the two occasions that he testified, and the credibility determinations that the Court made regarding other witnesses at the evidentiary hearing, the Court finds that Judge Martin's testimony, perhaps tempered by a motive for self-preservation, was simply not credible.

In *McCleskey,* a man in Georgia who had been sentenced to die challenged that state's capital sentencing process on the grounds that the killers of whites are more likely to be given a capital sentence than the killers of blacks.

As a black defendant who killed a white victim, McCleskey claims that the Baldus study demonstrates that he was discriminated against because of his race and because of the race of his victim. In its broadest form, McCleskey's claim of discrimination extends to *every actor in the Georgia capital sentencing process,* from the prosecutor who sought the death penalty and the jury that imposed the sentence, to the State itself that enacted the capital punishment statute and allows it to remain in effect despite its allegedly discriminatory application.

*McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1766 (emphasis added). The United States Supreme Court rejected the defendant's reliance on solely statistical evidence for this proposition.[14] In reaching this result, the Court set out what is necessary to establish a *"McCleskey"* equal protection claim. First, a defendant must establish "the existence of purposeful discrimination." *McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1766. Second, a defendant must make a more particularized showing that "the decision makers in *his* case acted with discriminatory purpose." *Id.*

**14.** Applicant's equal protection claim is as broad in scope as that rejected in *McCleskey.* We wish to note, however, that his argument and supporting evidence goes much farther than that of the defendant in *McCleskey.* Applicant not only

provided a study which supported the findings of the Baldus study, relied upon in *McCleskey,* but he introduced other types of evidence suggesting the presence of racial discrimination in his particular case.

Although there are few procedural barriers to proving an equal protection claim, the quantum of evidence necessary to sustain such a claim is high.

Implementation of these [capital punishment] laws necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, *we would demand exceptionally clear proof before we would infer that the discretion has been abused* [or tainted by racial considerations].

*McCleskey*, 481 U.S. at 297, 107 S.Ct. at 1769 (emphasis added). In weighing the sufficiency of applicant's evidence in support of this claim, I will jointly consider all evidence which serves to support a type of equal protection violation. In other words, I will consider jury selection, official bias, racial tensions within the courtroom and community, etc.[15] I will consider the factual findings made by the hearing judge in the order they were entered on Judge Pickett's order.

The first two factual findings were that applicant was a black man and that the victim, Cheryl Fergeson, was a 16 year old white girl. These two facts, standing alone, do not establish a claim which would entitle applicant to relief.

The third finding of fact concerned a study conducted by Dr. Sheldon Ekland–Olson indicating that a black man who rapes and kills a white woman is five times more likely than any other person who commits an offense that could be charged as capital murder to receive a death sentence. The hearing judge found the statistical evidence to be credible and persuasive.[16] The author of the study admitted, however, that this evidence failed to prove whether *applicant* was the victim of racial discrimination. Despite this limitation, Dr. Ekland–Olson's study and testimony establish a risk that applicant was the victim of racial discrimination. This statistical risk may be used as some circumstantial evidence to support applicant's claim. See *McCleskey*, 481 U.S. at 291 n. 7, 107 S.Ct. at 1766 n. 7.

The fourth through eighth findings of fact establish the racial composition of the juries in applicant's two trials for this offense;[17] the existence of a trial manual in the Montgomery County District Attorney's office which instructed prosecutors to exclude all blacks from criminal juries; that, at the time of applicant's trials, the Montgomery County District Attorney's office had a policy of excluding blacks from criminal juries and; that violation of this policy would require explanation to the elected District Attorney; and that no lawyer could remember the presence of a black on a criminal jury other than one Conroe police officer in 1978. Applicant argues that, taken together, these facts constitute proof that the juries in his cases were selected in an unconstitutionally discriminatory manner.

First, we begin by noting that the racial composition of the jury at applicant's first

---

15. The evidence in support of any given type of equal protection violation need not be sufficient to constitute an independent constitutional violation. For example, the facts in the record may or may not be sufficient to entitle applicant to relief under *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Regardless of the sufficiency of the facts to support a claim under *Swain,* those facts are relevant to applicant's contention that race was a factor in the entire proceeding against him. The totality of factors present in the trial underlying the instant cause are relevant to applicant's claim irrespective of the sufficiency of any individual factor. See *Batson v. Kentucky,* 476 U.S. 79, 96–97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986); *Washington v. Davis,* 426 U.S. 229, 241–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

16. Unlike the showing of a prima facie case of discrimination in a *Batson* setting, introduction, and even acceptance, of such statistical evidence requires no rebuttal on the part of the State absent additional and stronger evidence of discrimination. *McCleskey,* 481 U.S. at 296 n. 17, 107 S.Ct. at 1768–69 n. 17.

17. Applicant's first trial for the offense underlying this writ application ended in a mistrial because the jury was deadlocked on the issue of guilt/innocence. Applicant was convicted of capital murder and sentenced to death as the result of his second trial. Applicant is challenging the conviction arising from his second trial in the instant cause. The juries in both trials were all-white.

trial could never provide a direct basis of relief from his conviction at the second trial. The remedy available when a defendant proves that his jury was selected in a discriminatory manner is a new trial. The remedy for such a constitutional violation is reversal of the conviction, not a judgment of acquittal. E.g., *Whitus v. Georgia,* 385 U.S. 545, 553, 87 S.Ct. 643, 648, 17 L.Ed.2d 599 (1967). Because applicant's relief would not have barred reprosecution,[18] he was only entitled to a second trial, something he already received by virtue of the first mistrial. Thus even a valid claim concerning the first trial would not entitle applicant to anything he has not already received.

Second, the jury in the second trial was all-white and the State used peremptory challenges to remove blacks from the panel. This factual finding might, if it arose in a direct appeal, make a prima facie case that discrimination occurred in the jury selection process and entitle applicant to a hearing at which he could question the prosecutor on his use of peremptory challenges. *Batson,* 476 U.S. at 79, 106 S.Ct. at 1712. However, the Supreme Court has refused to extend the relaxed evidentiary burden of *Batson* to convictions that were final when *Batson* was decided. *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). Thus, in order for the jury selection process to rise to the level of an equal protection violation, applicant must satisfy the greater burden of proof set out in *Swain,* 380 U.S. at 223–26, 85 S.Ct. at 837–39.

In order to establish an equal protection violation under *Swain,* a defendant must prove purposeful discrimination in his trial, *Id.* at 223–24, 85 S.Ct. at 837–38, and estab-lish that the State's attorney in his trial has been guilty of discrimination in other cases. *Id.* at 225–26, 85 S.Ct. at 838–39. The reason for this dual burden is the presumption that the United States Supreme Court established that a prosecutor exercised his peremptory challenges in good faith. *Swain,* 380 U.S. at 222, 85 S.Ct. at 836–37.

Here, applicant has shown that blacks were excluded from his jury and that the State used peremptory challenges against the black veniremen. Such a showing may rebut the presumption of good faith on the part of a prosecutor. *Swain,* 380 U.S. at 222, 85 S.Ct. at 836–37. Such a showing, however, does not, by itself, establish purposeful discrimination within the first requirement of *Swain* nor past discrimination on the part of the prosecutor, as required in the second part of *Swain. Id.*

Applicant introduced evidence concerning a number of other facts related to jury selection which can be used to satisfy *Swain*'s requirements for additional proof. Applicant introduced evidence, and this evidence was accepted by the hearing judge, that the Montgomery County District Attorney's office used a manual which advised prosecutors to exclude blacks from criminal juries. Such a fact is probative of discriminatory intent on the part of the district attorney's office. *Batson,* 476 U.S. at 105, 106 S.Ct. at 1727–28 (Marshall, J. concurring).

In addition, applicant introduced evidence, once again accepted by the hearing judge, that District Attorney Keeshan had a policy of excluding blacks from juries and that failure to follow this policy would require that an explanation be made to Keeshan.[19] This testimony would seem to

---

**18.** Cf. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

**19.** The hearing judge's finding that there was a policy in the Montgomery County District Attorney's office is somewhat misleading. Frank Robbin, the witness upon whom the hearing judge based this finding, testified that it was his opinion that failure to challenge all blacks would require an explanation to Keeshan.

Q: [By Mr. DeGeurin] Now, if you were, while you were working for Judge Keeshan, then District Attorney Keeshan, if you were to allow a Black to remain on the jury where you had a Black defendant, what would you expect Mr. Keeshan to do?
A: Certainly, that would have been highly unusual. I don't recall it ever being done but I'm certain that Jim [Keeshan] would have asked why, what was your reasoning. What

establish that the prosecutor in applicant's case has used peremptory challenges in the past to exclude blacks, thus satisfying the second requirement of *Swain*. 380 U.S. at 226, 85 S.Ct. at 839. Finally, applicant introduced testimony that at least one witness remembered only one black, a Conroe police officer, who had ever served on a criminal jury in Montgomery County. This evidence is only circumstantial evidence of applicant's contention that jury selection in Montgomery County is tainted by racial consideration. Because defense attorney's can, and do, challenge black veniremen, the absence of blacks on past juries does not establish that the State is solely responsible for this historic phenomenon. *Swain*, 380 U.S. at 223–24, 85 S.Ct. at 837–38.

The evidence adduced by applicant would appear to make out a prima facie case under *Swain*, and the hearing judge rejected the State's rebuttal evidence on this issue. Applicant does not, however, claim that he is entitled to relief under this theory. Instead, applicant uses the facts surrounding jury selection in order to support a general claim that racial discrimination influenced the decision makers in his trial. We agree with applicant that these facts support an *inference* [emphasis mine] of discriminatory intent.

The ninth finding of fact states that the lone juror who voted to acquit applicant in the first trial, William Shreck,[20] was the victim of racially motivated harassment after the declaration of a mistrial. The record clearly supports a finding that Shreck received phone calls reflecting racial animus, and from these calls, one could infer that this animus extended to some portion of the local population. This evi-

dence, however, does have its limitations. Shreck knew neither how many people were involved in making the telephone calls nor who the people were. Thus, these incidents serve as only a crude barometer of the public climate. We agree with applicant that these calls serve as some indication that racial hostilities were at work in Conroe, but our inability to judge the extent to which these incidents reflected popular opinion at the time of applicant's second trial and the speculative inference about what degree of popular opinion might have affected the course of the trial, prevents me from giving this evidence more than token significance.

Shreck's remaining testimony concerned his failed attempt to secure employment with Montgomery County and Keeshan's hostile attitude toward him. While the record supports the finding that Keeshan was hostile to Shreck, there is no indication that Keeshan's feelings were racially motivated. I find it equally plausible that Keeshan resented Shreck for necessitating a second trial. This resentment over lost effort and the expense and trouble of a second trial provide a race neutral explanation of Keeshan's actions at the job interview. There is no necessity to look beyond the record and into Keeshan's soul and find that he was motivated by race in this instance.

The tenth finding of fact concerns a police officer's statement to Henry Peace concerning who perpetrated the murder. The officer said, referring to applicant, that "The nigger was elected." On its face, this statement reflects racial animus on the part of one of the State's investigators. An examination of the context of the state-

---

was the reason for leaving this particular juror as opposed to using a peremptory challenge.
Q: Do I understand then that as Assistant District Attorney, you would have to explain why you would have to explain why you would do such a stunt as to leave a Black man on the jury where you had a Black defendant?
A: He'd want to know why, he'd want some explanation. I'm not saying that there may have been an explanation that satisfied him,

but that was highly unusual and he would have wanted to know why.
Thus, this testimony supports an inference of a de facto policy to discriminate against black veniremen and defendants; however, the existence of a de jure policy is not supported by the record.

20. The statement of facts spells this former juror's name "Sreck," and the findings of fact designate him as "Shreck." I am unable to determine which is the correct spelling.

ment, however, suggests that the statement is less indicative of a racially motivated investigation than would appear at first blush. The testimony concerning this incident reveals:

Q: (By Mr. DeGeurin) Mr. Peace, let me repeat my question as best I can. After you, when you and Clarence Brandley first spoke to any police officer, did any police officer indicate to you who a suspect would be in the case?

A: Yes, sir.

Q: Can you tell the Court what was said to you by the police officer?

A: Yes, sir. I was on the left hand side and ...

Q: Just take you time, Mr. Peace.

A: I don't remember which side I was on now. I can tell what you [sic] the police officer did say, though.

Q: What did he say?

A: He told me that I wasn't strong enough or tall enough and that they had a lot of pressure put on them and Mr.—Well, they called him—

THE WITNESS: Your Honor, can I say when [sic: what] they called him?

THE COURT: Yes, sir.

A: (Continuing) They said that the nigger was tall enough and strong enough and he was elected.

\* \* \* \* \* \*

Q: The answer was?

A: I said that they did say that the nigger would be the one that was elected or is elected or something like that.

Q: Did he also say to Mr. Brandley in your presence, You're a colored guy, Conroe doesn't like colored people, so nigger, you're elected?

A: I don't remember that.

Although the police officer's statement that "the nigger is elected" shows the grossest of racial insensitivity, the context of the statement indicates that applicant was "elected" because of his physical ability to commit the crime, not his race. Although Peace's testimony raises a very strong inference that the police officer in question was a racist, it also illustrates that his focus on applicant as a suspect was grounded in legitimate and race-neutral reasons. This incident fails to establish that any decision maker was swayed in the exercise of his discretion by racial considerations. Thus, this factor does not contribute to applicant's claim under *McCleskey*.

In further support of his *McCleskey* claim, applicant complains that his initial bond was set at $30,000. Applicant attempted to post bond but the Sheriff of Montgomery County refused to accept the bond. An ex parte order was issued by Judge Alworth, raising the required bond to $70,000. In particular, applicant complains that the testimony at the evidentiary hearing revealed that the Sheriff of Montgomery County, Gene Reaves, and James Keeshan, opposed applicant's posting of bond because of his race. When applicant attempted to post bond, Sheriff Reaves stated that "the little Nigger [sic] doesn't belong on the ground." District Attorney Keeshan acknowledged that he was present when the sheriff used this phrase, but he denied using this phrase himself. Keeshan subsequently met with Judge Alworth without notice to defense counsel. The ex parte order raising the required bond amount was issued after this meeting. Judge Pickett found in favor of the applicant on these disputed facts.

Applicant was subsequently convicted after the allegedly wrongful denial of bond. Because of applicant's subsequent conviction, this issue is moot and provides no independent avenue for relief to applicant. *Wheeler v. State*, 496 S.W.2d 85 (Tex.Cr. App.1973); *Waddle v. State*, 482 S.W.2d 647 (Tex.Cr.App.1972).

The twelfth finding of fact sets out some evidence that the courtroom atmosphere at applicant's first trial was charged with racial tension. However, this evidence does not show that any decision maker was affected by this tension. An example of the

shortcomings of this evidence is the testimony of Janet Dial.

Her testimony provided the basis for the finding that a woman was saying "kill the nigger, kill the nigger...." While Dial testified that a woman in the back of the courtroom said this, she could not say whether any member of the jury could hear the statement. Similarly, Rev. Robinson's testimony concerning deputies following black spectators from the courtroom fails to establish that the jury was aware of this practice or that it affected any of the participants in any way. I am unable to assign a definite degree of weight to this evidence because of the grossly speculative nature of the inferences required.

The thirteenth finding of fact concerns the "team-like" attitude between the prosecutor's office and court personnel. I feel that this evidence should be treated identically to that concerning Keeshan's conduct at Shreck's job interview. While the testimony suggests improper conduct on the part of court staff, it fails to establish that any of this behavior was motivated by racial considerations. Absent a showing that links their actions to race, this evidence should not be considered in regard to a claim under *McCleskey*.

I would reject the hearing judge's finding that:

the color of Clarence Brandley's skin was a substantial factor which pervaded all aspects of the State's capital prosecution against him, and was an impermissible factor which significantly influence the investigation, trial and post trial proceedings of Petitioner's case.

The record in this cause simply does not establish "exceptionally clear proof" of applicant's claim as required by *McCleskey*. Applicant should be denied relief under this claim.

For all of these reasons, I dissent.

McCORMICK, P.J., and W.C. DAVIS, J., join in this opinion.